Randy SAENZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–97–217–CR.

Court of Appeals of Texas,
Corpus Christi.

Aug. 13, 1998.

Anne M. Marshall, Corpus Christi, for appellant.

Carlos Valdez, Dist. Atty., James D. Rosenkild, Asst. Dist. Atty., Corpus Christi, for state.

Before DORSEY, HINOJOSA and RODRIGUEZ, JJ.

## OPINION

HINOJOSA, Justice.

A jury found appellant, Randy Saenz, guilty of murder and assessed his punishment at thirty years imprisonment. At the time of the offense, appellant was fourteen years old. By four points of error, appellant challenges his certification to stand trial as an adult, argues that no evidence corroborates the testimony of an accomplice witness and no evidence establishes a culpable mental state, and complains of jury misconduct. We affirm.

### Background

At approximately 10:00 p.m. on May 21, 1996, seventeen-year-old Gilbert Flores, six-

teen-year-old Raymond Montalvo, and twenty-one-year-old John De la Rosa arrived in Corpus Christi from Portland to visit appellant's older sister. Shortly thereafter, Montalvo, De la Rosa, and appellant left in Flores's maroon, four-door car, saying they were going to a nearby store to put gas in the car and buy snacks. De la Rosa was driving, appellant was in the front passenger seat, and Montalvo was in the back seat, sitting behind appellant.

Instead of going to the store, the three drove to Villa Street and cruised slowly up and down the street three times. Roger Ayala and some of his friends were "hanging out" in the driveway of 425 Villa Street and noticed the cruising car. All of the boys knew and recognized appellant in the front seat. Threatening gestures were exchanged. After passing by Ayala and the others for the third time, appellant directed De la Rosa to the home of another friend, Joey Gallardo. Appellant went up to the house and returned alone. The trio then drove back to Villa Street, approaching it from Quaile Street, where they stopped and sat for a couple of minutes.

About 10:30 p.m., Ayala saw and recognized the maroon car at the intersection. Suspicious, Ayala and one of his friends, Alex Franco, walked down to the end of the driveway for a better look. They saw someone leaning out of the passenger side window just before shots were fired. Franco ran for cover. One bullet hit Ayala just above the right hip, causing massive internal injuries. He did not regain consciousness before dying early the next morning.

Appellant and his friends returned to appellant's house around 11:00 p.m. His sister noticed that they had not brought any food with them. Montalvo and De la Rosa immediately left again to put gas in the car and to get snacks at the corner convenience store. Appellant went inside his house to call his girlfriend and tell her he had just returned from the Maverick Market, a few minutes walk from his home.

Appellant learned of Ayala's death early the next morning. He skipped school that day and went shopping for a used vehicle with his stepfather. He was found at the car

dealership by police and taken in for questioning. He made a statement regarding his involvement in the shooting and signed it in the presence of a judge.

Appellant was charged with murder, a first-degree felony allegation. Because appellant was fourteen-years-old at the time, the State filed a petition to have him certified to stand trial as an adult. Appellant filed a motion to quash, which was denied prior to the certification hearing. After hearing the certification proceeding, the juvenile court waived jurisdiction and transferred appellant to the criminal courts. Appellant was subsequently indicted for murder and tried as an adult.

### Felony Merger Rule

By his first and second points of error, appellant contends the juvenile court erred by refusing to quash the indictment and by certifying him to stand trial as an adult.

Appellant contends the felony merger doctrine prohibits basing a charge of felony murder on the identical conduct of a lesser-included offense which caused the death. In other words, because no additional or different element of conduct must be shown, deadly conduct, a third-degree felony, cannot be bootstrapped to a first-degree felony simply because a death occurred. Appellant argues that because the evidence does not otherwise support a finding of the commission of a first-degree felony, he could not be tried as an adult.

 We conclude appellant's reliance on the felony merger doctrine is misplaced as it is not applicable under the instant circumstances. The appellant in *Rodriguez v. State*, 953 S.W.2d 342 (Tex.App.—Austin 1997, pet. ref'd), was convicted of felony-murder based on his repeated discharging of a firearm into a car he knew to be occupied. *Id.* at 343–44. Rodriguez challenged his conviction, arguing that he had merely engaged in deadly conduct and such could not be the basis of the felony-murder charge under the merger rule. *Id.* at 345. Judge Onion addressed Rodriguez's point in an exhaustive review of the history and development of the felony murder rule, including a close exami-

nation of *Garrett v. State,* 573 S.W.2d 543 (Tex.Crim.App.1978) (prohibiting felony-murder prosecution based on aggravated assault). *Rodriguez,* 953 S.W.2d at 345–52. The Austin Court of Appeals concluded that the express language of the current penal code, rather than the rationale of *Garrett,* governs prosecutions in cases such as the one before it, and the statutory language clearly serves to elevate deadly conduct to felony-murder when a death occurs. *Id.* at 354; *accord Medellin v. State,* 960 S.W.2d 904, 906–7 (Tex.App.—Amarillo 1997, no pet.). The legislature has never adopted or approved the *Garrett* decision. By the plain language of the statute, only manslaughter is exempted as an underlying felony under the felony merger rule. *Rodriguez,* 953 S.W.2d at 354.

We agree with our sister courts that the felony merger doctrine does not prevent the State from using a defendant's deadly conduct as the basis for a charge of felony murder. Because appellant was properly charged with a first degree felony, as required for certification as an adult under TEX. FAM.CODE ANN. § 54.02(a) (Vernon 1996), the juvenile court did not err in granting certification.

The basis of appellant's motion to quash was much the same as that against his eligibility for certification as an adult. Because we find he was properly certified, the juvenile court did not err in refusing to quash the indictment.

Appellant's first and second points of error are overruled.

*Accomplice Witness Testimony and Legal Sufficiency of the Evidence*

Appellant's third point of error has two parts. First, he contends the testimony of

Raymond Montalvo, a confessed participant in the shooting of Roger Ayala, is not sufficiently corroborated by other evidence, *i.e.,* if the accomplice testimony is excluded, there is no evidence to support the verdict.[1] Second, he contends there is no evidence appellant intended to seriously injure or kill Ayala. Appellant does not contend the evidence is factually insufficient.

The code of criminal procedure provides, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. art. 38.14 (Vernon 1979).

■ The test for sufficient corroboration is to eliminate from consideration the accomplice testimony, and then examine the other inculpatory evidence to ascertain whether the remaining evidence tends to connect the defendant with the offense. *McDuff v. State,* 939 S.W.2d 607, 612 (Tex.Crim.App.1997); *Burks v. State,* 876 S.W.2d 877, 887 (Tex. Crim.App.1994). The non-accomplice evidence does not have to directly link appellant to the crime, nor does it alone have to establish his guilt beyond a reasonable doubt; but rather, the non-accomplice evidence merely has to tend to connect appellant to the commission of the offense alleged in the indictment. *McDuff,* 939 S.W.2d at 612; *Burks,* 876 S.W.2d at 888; *Gill v. State,* 873 S.W.2d 45, 48 (Tex.Crim.App.1994). Non-accomplice evidence that the defendant was in the company of the accomplice at or near the time or place of the offense is proper corroborating evidence. *Hernandez v. State,* 939 S.W.2d 173, 178 (Tex.Crim.App.1997) (citing *Jackson v. State,* 745 S.W.2d 4, 13 (Tex.Crim.App.

---

**1.** In the instant case, appellant failed to request an instruction on the accomplice witness rule and none was included in the jury charge. The Texas Court of Criminal Appeals has implied this failure results in waiver of the issue. *See Hernandez v. State,* 939 S.W.2d 173, 180 n. 2 (Tex. Crim.App.1997) (questioning this court's review of accomplice witness testimony in the absence of such instruction and citing *Boozer v. State,* 717 S.W.2d 608, 610 (Tex.Crim.App.1984) (sufficiency of the evidence is to be measured by the charge *that was given* ) (emphasis in original)).

Because the court of criminal appeals did not make clear an intention to overrule its opinion in *Hammonds v. State,* 166 Tex.Crim. 499, 316 S.W.2d 423, 424 (1958) (where no accomplice witness charge was requested or given, a reviewing court, "in passing upon the sufficiency of the evidence, must treat the testimony of [an accomplice] as that of an accomplice witness and find sufficient evidence from other sources tending to connect appellant with the commission of the offense"), we will apply the accomplice witness rule in the interest of justice.

1988)) (presence in company of accomplice near time of offense not alone conclusive, but important factor for corroboration); *McDuff*, 939 S.W.2d at 612; *Meador v. State*, 941 S.W.2d 156, 159 (Tex.App.—Corpus Christi 1996, pet. ref'd). Accordingly, we review the facts and determine whether the accomplice testimony is adequately corroborated.

On the night of the shooting, appellant went riding in a maroon, four-door car with his friends John De la Rosa and Raymond Montalvo sometime after 10:00 p.m. De la Rosa and Montalvo lived in Port Aransas and Gregory—Portland respectively and neither appears to have been familiar with Corpus Christi streets. Several turns were required to get from Greenpath Street, where appellant lived, to Villa Street. Appellant had once lived with his grandmother on a street near Villa Street, in the same neighborhood as Roger Ayala.

The three told the car's owner, Gilbert Flores, that they were going to get gas and snacks. A Maverick Market stood on a corner about one-half mile from appellant's home. Instead of stopping at the convenience store, the three drove to Villa Street and cruised slowly up and down the road three times.

By his own admission, appellant was a gang member. He joined the Ruthless Gangsters when he was eleven years old. Eight months before Ayala's death, appellant informed Todd Green, a Corpus Christi Police Officer, that he had joined another gang, the Navarro Five, whose territory included a neighborhood he had lived in some time before. Ayala was a member of a rival gang, the West Side Gangsters, an enemy of the Navarro Five. Appellant admitted knowing the members of the West Side Gangsters and that Villa Street was West Side Gangsters territory.

There was a street lamp in front of 425 Villa Street. As he rode by, appellant recognized Ayala and several other members of the West Side Gangsters standing in the driveway. They, in turn, recognized appellant, as most knew him from the days he lived in the neighborhood with his grandmother. Appellant raised his hand and mimed pointing a gun and pulling the trigger as the car passed within twenty feet or so of the boys. In gang sign language, this meant he had a gun and was threatening to use it. On the next pass, Ayala threw up his hands in a gesture of challenge to the car's occupants to stop and fight it out with fists. None of the boys in the driveway had weapons of any kind. After the third pass, Ayala speculated to the others about whether appellant was setting-up for a drive-by shooting in reprisal for a windshield Ayala's friend had smashed earlier that evening.

After the third pass, appellant directed De la Rosa to the house of a friend, Joey Gallardo, for an unknown reason. De la Rosa had no knowledge of how to get to Gallardo's house from Villa Street. Appellant was the only one who went up to Gallardo's house. Although someone answered the door, appellant returned to the car alone.

The three then drove up Quaile Street to the intersection with Villa Street and halted by the stop sign. From there, appellant admitted he could see people in the driveway of 425 Villa Street. They sat there for about two minutes "looking for traffic" although appellant admitted there was no traffic on the street at all that night. Appellant admitted the shooting took place while they sat at the stop sign and the shooter was a passenger in the car.

Appellant admitted, and all of the witnesses at the scene of the shooting agreed, appellant was the front seat passenger in the car from which the shots were fired. There was a street lamp at the corner of Quaile Street and Villa Street where the maroon car stopped. One witness who was looking at the car just before the shots were fired said he could see the passengers hanging out the windows on the right side of the car and that they were wearing light colored shirts. Appellant admitted he was the only passenger wearing a white t-shirt that night; Montalvo's was black.

Immediately after the shooting, appellant, De la Rosa, and Montalvo returned to appellant's home, arriving at approximately 11:00 p.m. Appellant immediately went inside and called his girlfriend, telling her he had just come back from a trip to the store. He did

not call the police to report the shooting. De la Rosa and Montalvo then went to get the gas and snacks they had promised before.

Gilbert Flores, a friend of appellant's sister, testified that before he left to ride home to Gregory—Portland with De la Rosa and Montalvo, appellant told him, "Yeah, man, I fired three shots and—but the fucking gun jammed." Flores rode back in the front passenger seat while De la Rosa drove. He asked the others about appellant's statement and learned of the shooting. At some point along the way home, Flores noticed a black nine-millimeter Beretta on the driver's side floor of his car. How and when it was disposed of is not known. The weapon was never recovered.

The next morning, at approximately 8:00 a.m., Flores answered a page from appellant's sister, who told him Ayala had died. Appellant came on the line, and Flores asked him, "Hey, what happened, man?" Appellant replied, "Nah, man, I fucked him up, I did it." Appellant hung up before Flores could ask for more details.

Appellant admitted in his written statement that his sister informed him of Ayala's death about 8:15 a.m. on May 22, 1996. He testified he knew then the police would be looking for him. Although he was well, he did not go to school that day and did not stay at home. Appellant accompanied his stepfather to a used car dealership where police found him sometime after 10:00 a.m.

Janie Luis witnessed the windshield smashing incident Ayala mentioned shortly before his death. Ayala and a friend, Vincent, had gone to the car wash across the street from Luis's home to wash a pickup truck. Luis was watching them a little before 9:00 p.m., when appellant and Ernest Benavides pulled into the car wash, got out of their car, and began arguing with Ayala. Appellant and Benavides got back into their car. Benavides then tried to run down Ayala, who ran across the parking lot to escape. Ayala's friend Vincent jumped on Benavides's car and smashed the windshield to stop the car. Benavides drove off. Ayala and Vincent left the car wash shortly thereafter.

Luis testified she knew appellant's parents very well, that she knew other members of appellant's family, and had known appellant since he was very young. She also knew Ayala, although not quite as well, as a friend of her nephew. She came forward to testify to what she had seen on the day of the shooting because, "I was the only one here not of the family of Roger [Ayala], not of the family of Randy [appellant] ... I ain't in nobody's side, not even Randy's, not even Roger's ... I wanted for the jury to really know how it really started. It started at the car wash."

Luis further testified Benavides was a member of the same gang as appellant and that she had seen the two boys on at least one occasion, "when they approach two other boys ... with their own weapons in their own hand." John Rodriguez, a Corpus Christi Police Officer, confirmed that Benavides and appellant were members of the same gang and added that Benavides and Ayala had several run-ins before Ayala's death. Another witness identified Benavides as a member of the Ruthless Gangsters and stated the gang had a reputation for violence.

Benavides confirmed that his windshield had been smashed by Ayala's friend, Vincent, a few hours before Ayala was killed. He admitted fighting with Ayala within a few months of his death and grudgingly admitted paternity of appellant's niece.

There were no known connections between De la Rosa and Montalvo and any member of the West Side Gangsters. None of the witnesses stated they knew or recognized or had even heard of either man.

Two shell casings were found by the roadside at the intersection of Quaile Street and Villa Street. Experts determined the casings were compatible with the bullet recovered from Ayala's body, subsequently determined to be a nine-millimeter caliber. Corpus Christi Police Officer Ruben Garcia testified that the weapon must have been a semi-automatic rather than a revolver because only a semi-automatic could eject casings.

Appellant claimed at trial he never saw the gun used to shoot Roger Ayala, yet he de-

scribed it to police the morning after the shooting as a black nine-millimeter pistol. The caliber of the bullet that killed Ayala had not yet been determined on the morning of May 22. No other witness who claimed to have seen the gun had been identified or arrived at the police station for questioning before appellant signed his statement describing the gun. When other witnesses talked about the gun allegedly used in the shooting, their descriptions tallied with appellant's.

We conclude the evidence does tend to connect appellant to the murder of Ayala and provides sufficient corroboration of Montalvo's testimony. Accordingly, we will consider Montalvo's testimony in our review.

■ Appellant was charged with murder under section 19.02 of the Texas Penal Code. He was indicted under two counts, the first alleging that he intentionally and knowingly caused the death of an individual, TEX. PEN. CODE ANN. § 19.02(b)(1), and the second alleging that he intended to cause serious bodily injury to an individual by committing an act clearly dangerous to human life that resulted in an individual's death. TEX. PEN. CODE ANN. § 19.02(b)(2). The jury's verdict did not specify on which count it was based.

■ In evaluating the legal sufficiency of the evidence of guilt, we must consider all of the evidence. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This includes the accomplice witness testimony. *McDuff*, 939 S.W.2d at 614. In making such evaluation, we must view *all* of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* (citing *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781) (emphasis in original).

Montalvo's testimony added very little to that adduced by other witnesses. Before they left to get gas and snacks, appellant said, "I feel like making a drive-by." Appellant did not say he wanted to shoot anyone in particular, and Montalvo treated it as a joke. Once in the car, appellant gave De la Rosa directions to Villa Street. Montalvo was un-

familiar with the area and did not know any of the boys at 425 Villa Street, although it was obvious appellant knew them and not as friends. When they stopped on Quaile Street, appellant pulled a gun from under the front seat, cocked it, leaned out the window, and shot three times at the boys in the driveway of 425 Villa Street. He stopped shooting only because the gun jammed. Appellant then said he wished the gun had not jammed.

Paul Rivera, an investigator with the Nueces County Sheriff's Department, testified that Montalvo gave a statement on May 22, indicating appellant suggested the trio go to Villa Street and do a drive-by shooting.

Intent is a fact issue for the jury to resolve. *See Robles v. State*, 664 S.W.2d 91, 94 (Tex.Crim.App.1984); *Rodriguez v. State*, 793 S.W.2d 744, 748 (Tex.App.—San Antonio 1990, no pet.). Intent or knowledge may be inferred from the acts and circumstances surrounding a crime. *Hernandez v. State*, 819 S.W.2d 806, 809–10 (Tex.Crim.App.1991). The specific intent to kill may be inferred from the use of a deadly weapon, unless the manner of its use makes it readily apparent that death or serious bodily injury could not result. *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex.Crim.App.1993) ("[i]f a deadly weapon is used in a deadly manner, the inference is almost conclusive that [the defendant] intended to kill...."); *Godsey v. State*, 719 S.W.2d 578, 580 (Tex.Crim.App.1986).

The evidence shows that appellant used a deadly weapon in a deadly manner by firing in the direction of several people he could plainly see. Appellant's car sat at the corner of Quaile Street and Villa Street for some time until Ayala and another boy walked down to the end of the driveway under the street lamp and looked towards the car. Although the individuals' features were not distinguishable, appellant admitted knowing he was looking at people. As the victim stood looking at the car, shots were fired, one of which killed Ayala.

■ It is common sense to realize that when a gun is discharged, the bullet must strike something in the vicinity of where the gun is pointed, regardless of distance and

whether the shooter was taking careful aim. It is also common sense to realize that if people are standing before the gun, the bullet may strike a person. Even though marksmen testified it would be difficult to hit a specific target from a distance of 469 feet, none said it would be impossible. Good luck in striking the target could not be ruled out either. One witness testified that the probability of a bullet striking a person increased as there was more than one person in the area. Repeatedly shooting a firearm in the direction of people is clearly an act dangerous to human life.

The evidence indicates that only appellant had knowledge of the neighborhood where the shooting took place, was acquainted with the victim, and was an enemy of the victim for multiple reasons. He was involved in a violent encounter with the victim a few hours before the killing. He non-verbally indicated his intent to shoot the victim just prior to the killing. After the shooting, he expressed his disappointment that the gun had jammed. He did not inform the police of the shooting, despite his trial testimony that he had been present at the shooting against his will and disavowing De la Rosa and Montalvo as friends. The next day, appellant was excited when he learned Ayala had died and claimed credit for his death. Aware the police would be looking for him, he did not go to school or stay at home, the two places they would logically look for him. Later, he accurately described the type and caliber of weapon used in the shooting before the police had any other information. His description of the weapon was supported by other evidence.

We hold any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. We hold the evidence is legally sufficient to support appellant's conviction. Appellant's third point of error is overruled.

**2.** A fifth juror provided an affidavit which was not offered into evidence. Appellant asked the court to take judicial notice of the affidavit which was attached to his motion for new trial. The court did not rule on the request and apparently did not review the affidavit. A juror's affidavit attached to a motion for new trial on grounds of alleged jury misconduct does not prove itself.

## Juror Misconduct

By his fourth point of error, appellant complains the jury received additional evidence after retiring to deliberate. He contends that, absent this "other evidence," the jury would not have agreed on his guilt. Therefore, he argues, the trial court erred in denying his motion for new trial on this issue.

Under the Texas Rules of Appellate Procedure, a new trial shall be granted an accused if, after retiring to deliberate, the jury received other evidence or engaged in such misconduct that the accused did not receive a fair and impartial trial. Tex.R.App. P. 21.3(f); *Bath v. State*, 951 S.W.2d 11, 17 (Tex.App.— Corpus Christi 1997, pet. ref'd); *see also Von January v. State*, 576 S.W.2d 43, 45 (Tex. Crim.App.1979). In order to compel a new trial, the other evidence relied upon must have been (1) received by the jury and (2) detrimental to the defendant. *Bath*, 951 S.W.2d at 17; *Martinez v. State*, 846 S.W.2d 348, 350 (Tex.App.—Corpus Christi 1992, pet. ref'd). The trial judge is the trier of fact at the hearing on a motion for new trial, and his findings will not be disturbed absent a showing that he abused his discretion. *Tollett v. State*, 799 S.W.2d 256, 259 (Tex.Crim. App.1990); *Jones v. State*, 596 S.W.2d 134, 138 (Tex.Crim.App.1980); *Bath*, 951 S.W.2d at 17. No abuse of discretion exists where there is *conflicting* evidence and the motion for new trial is overruled. *Tollett*, 799 S.W.2d at 259; *Bath*, 951 S.W.2d at 17.

Specifically, appellant complains of two matters. First, appellant complains that five members of the jury who had experience with firearms "educated" the other seven who, presumably, lacked such experience. Second, appellant contends one member of the jury talked about his personal experience as a gang member in Chicago many years ago. Four of the twelve jurors testified at appellant's motion for new trial.[2]

*Dugard v. State*, 688 S.W.2d 524, 529 (Tex.Crim. App.1985). Judicial notice is, therefore, not mandatory despite a party's request. *See* Tex. R.Crim. Evid. 201. An affidavit attached to a motion is considered a pleading rather than evidence. It must be introduced as evidence at the hearing, otherwise it will not be considered as such. *See Stephenson v. State*, 494 S.W.2d 900,

■ The former gang member did not represent himself as an expert on gangs, nor did he endeavor to tie his own experiences in with any particular aspect of the trial. None of the jurors paid any special attention to his comments, and none considered them in reaching their verdict. The juror's comments appear to have been in the nature of a casual remark. The determination of whether a jury has "received" other evidence is a question of degree, and a passing remark will not constitute receipt of other evidence. *Baldonado v. State,* 745 S.W.2d 491, 495 (Tex.App.—Corpus Christi 1988, pet. ref'd).

■ Appellant contends that, despite the absence of testimony concerning how semi-automatic weapons eject shells and a complete lack of evidence to show where the car was stopped prior to the shooting, several jurors with firearms experience discussed how most semi-automatic pistols eject shells to the right and considered the presumed location of the car at the intersection in deciding that appellant had to be the shooter. Appellant bolsters this argument by pointing out that one juror, whose identity is not entirely certain, declared after the trial, "If it hadn't been for the five shooters on the jury we wouldn't have been able to reach a verdict."

According to the testimony, the driver brought the car to a halt at the intersection by the stop sign and sat without moving for up to two minutes. The evidence at trial established that the weapon used was a semi-automatic nine millimeter and that it ejected two shell casings. The evidence also established that the shots were fired from the direction of the intersection where appellant admittedly sat in the front seat of the maroon car. A witness saw at least one person in a light-colored shirt leaning out of the car window just before the shots were fired. Appellant admitted that he was the passenger wearing a light-colored shirt. Shell casings from a nine-millimeter gun were later discovered on Quaile Street at the intersection with Villa Street. Photographs of the car and the intersection, with markers showing the location of the casings, were introduced into evidence at the trial.

Each of the four jurors called to testify at the motion for new trial agreed there had been discussion that, in the personal experience of each of them, semi-automatic weapons usually eject spent shells to the right. No one represented himself as an expert, and all claimed they spoke from general rather than specialized knowledge. Several also mentioned the testimony that the car stopped at the intersection and did not pull into the cross-street, allowing them to judge the car's approximate position prior to the shooting. The jurors indicated that each had drawn deductions from their personal knowledge and experiences combined with the testimony and other evidence introduced in the trial in deciding appellant's guilt.

■ Jurors are expected to draw upon their own experiences and common knowledge and apply them to the facts at hand. *Zuniga v. State,* 635 S.W.2d 780, 781–82 (Tex.App.—Corpus Christi 1982, pet. ref'd). The Texas Court of Criminal Appeals stated long ago:

We do not understand that juries, in reaching their verdicts, are denied the right of reasoning out propositions and drawing deductions and conclusions therefrom. They have a right to weigh testimony that comes before them. *They have a right to discuss it in the jury room and give their reasons as well as to draw their conclusions and to express those conclusions to one another.*

*Reagan v. State,* 57 Tex.Crim. 642, 124 S.W. 685, 687 (App.1910) (emphasis added).

In *Frazer v. State,* 99 Tex.Crim. 89, 268 S.W. 164, 166 (1925) (op. on reh'g), the court of criminal appeals addressed a question similar to that presented here: a discussion by at least three jurors on the subject of how a gun leaves powder burns. The jurors debated whether the powder burns and bullet hole in the victim's clothing controverted the appellant's testimony of how the shooting occurred. *Id.* There had been no testimony or other evidence concerning powder burns.

909–10 (Tex.Crim.App.1973); *accord Gillett v. State,* 663 S.W.2d 480, 481 (Tex.App.—Corpus Christi 1983, no pet.).

*Id.* After reviewing the evidence, the court concluded that the discussion did not constitute the introduction of new testimony or evidence. *Id.*

The court reached a similar decision in *Borroum v. State,* 110 Tex.Crim. 243, 8 S.W.2d 153 (1927) (op. on reh'g). In this case, the appellant claimed the decedent had been shot, then staggered back a few steps before falling. *Id.* 8 S.W.2d at 155. No evidence was adduced to show whether a person shot in the manner described would immediately fall in his tracks or stagger. *Id.* During deliberations, a juror stated his conclusions drawn from these facts, and his personal experience that the victim would have dropped when he was shot, not continued to move. *Id.* at 154. The court determined that the juror's expression was one of opinion, rather than additional evidence. *Id.* at 156.

In *Flix v. State,* 782 S.W.2d 1, 3 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd), some of the jurors who drove by the scene of the crime testified that during deliberations they had commented about the layout of the streets around the shooting, a fact not brought out in the trial. *See id.* None of the jurors who testified at the hearing stated that the comments made by the jurors who visited the scene affected their final verdict. *Id.* Photographs and other evidence of the crime scene had been introduced at the trial. *Id.* The court distinguished these facts from *Shivers v. State,* 756 S.W.2d 442, 444 (Tex. App.—Houston [1st Dist.] 1988, no pet.), where a juror's private viewing of the crime scene resulted in the acquisition of knowledge not shown by or deducible from the trial evidence. The court decided that no "other evidence" had been adduced in the case. *Id.*

■ The trial court apparently determined the jurors discussed the evidence adduced at trial, used that evidence in conjunction with their own knowledge of firearms, and thus received no other evidence that was material or detrimental. Whether the jurors received other information is a fact question for the trial court. The court apparently determined after listening to testimony that the only material matter the jurors relied on, to appellant's detriment, was their own general experiences and perceptions.

Although appellant claims the five "educated" the other members of the jury by talking about their general knowledge of and experiences with semi-automatic handguns, there is no evidence to show that this is so. Only the jurors who already possessed the knowledge were called to testify at the hearing for new trial, and none could say how much, if any, influence their personal experience and discussion had on the decisions of the other jurors. Even if there was influence, we find no evidence in the record that any juror changed his or her decision based on the discussion of the shell casings. Regardless of whether the discussion was "other evidence," appellant has failed to show any detrimental impact.

The alleged exclamation of one unidentified juror that "if it hadn't been for the five shooters on the jury we wouldn't have been able to reach a verdict" is too ambiguous to serve as evidence of influence leading to a change of mind. The speaker may have meant that she, personally, could not have reached a verdict "but for" the discussion, or she might have meant that she thought others would not have agreed "but for" the discussion. Furthermore, two of the witnesses at the motion for new hearing declared that no one made such a statement. The trial court could properly deny appellant's motion in the face of conflicting evidence. We defer to the trial court's fact finding.

We hold the trial court did not abuse its discretion in overruling appellant's motion for new trial. Appellant's fourth point of error is overruled.

We affirm the judgment of the trial court.