

NUMBER 13-10-00369-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

RAFAEL CAMACHO,                                                                          Appellant,

v.

THE STATE OF TEXAS,                                                                    Appellee.

## On appeal from the 105th District Court
## of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Justice Rodriguez

Appellant Rafael Camacho challenges his conviction for failing to stop and render assistance, a third-degree felony. *See* TEX. TRANSP. CODE ANN. § 550.021 (West Supp. 2010), § 550.023 (West 1999). Camacho pleaded not guilty, and his case was tried to a

jury. At the close of the State's case, the trial court denied Camacho's motion for directed verdict. The jury found Camacho guilty and sentenced him to four years in the Texas Department of Criminal Justice, suspended for ten years of community supervision. By two issues which we will address as one, Camacho argues that the evidence was insufficient to convict him. We affirm.

## I. BACKGROUND[1]

Mark Benavides testified that on August 18, 2009, around 4:30 or 4:45 p.m., he was driving along Bauer Road in Robstown, Texas when he saw Sandra Zarafonitis[2] lying on the side of the road in a field. When Benavides stopped and got out of his car, he observed that a white Ford F-250 truck parked on the other side of the road "just booked it and took off," going about three to four blocks on Bauer before turning right onto Power Plant Road. Benavides explained that he recognized that same truck in a surveillance video shown to him by the detectives. On cross-examination, Benavides testified that, in his statement to police, he described the vehicle as an "older model heavy duty pickup truck" and that he told a man who called 9-1-1 only that it was a white truck. Benavides testified that after he saw the media coverage that said it was an F-250, he agreed. Benavides also testified that he came up on the truck from the back and stopped before he got to its window; he "couldn't see [through the back part of the truck] because [he was] lower than what the truck was," and he did not see anyone in the truck.

---

[1] Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4.

[2] "Zarafonitis" is also spelled "Zarafonetis" and "Zarafontis" throughout the record. Camacho uses the spelling "Zarafonitis" in his brief. For consistency, we will do likewise.

Max Mesa testified that on August 18, 2009, at about 4:00 in the afternoon, he was driving north on Bauer Road when a big white truck that looked like a Ford passed him going about fifty miles an hour in a thirty-mile-per-hour speed zone. It turned onto Power Plant Road. Mesa explained that he then passed a man getting out of his car. Mesa turned his vehicle around to see if he could help. When he saw that the man was holding a woman, Mesa called 9-1-1. On cross-examination, Mesa agreed that he told the 9-1-1 operator that the truck that left the scene was a Chevy truck based on information provided to him.

Robstown Patrolman Carlos Pena testified that he was the first officer on the scene. During Officer Pena's testimony, when the State offered his accident scene diagram as an exhibit, the defense asked that Officer Pena's entire traffic accident report be offered. The State agreed to do so, and trial court admitted the complete report as State's Exhibit 58. Officer Pena testified that the report alleged the offense of failure to render aid, a felony charge. Officer Pena also testified that six or seven days after the traffic accident, after speaking with Detective Enrique Paradez, another investigating officer, he also named Camacho in the report because he believed him to be a suspect. The report identified Camacho as the driver and owner of the 2002 white Ford F-250 pickup that struck Zarafonitis from behind and left the scene of the accident. Camacho requested no limiting instruction concerning the representations made in that accident report. Officer Pena also testified that, based on his experience and his investigation, he believed a motor vehicle struck Zarafonitis.[3]

_____

[3] On cross-examination, paramedic Mark Mireles who "worked a call for . . . Zarafonitis," agreed that, in his report, he wrote that a "bystander said that the patient was struck by a vehicle." Mireles testified

Martin Flores, a detective with the Robstown Police Department, testified that when he was called to investigate the case, he went immediately to the hospital where he was informed that Zarafonitis had died. According to Detective Flores, he visited the scene of the accident the next day and viewed surveillance videos from surrounding properties. Detective Flores testified that the surveillance videos showed "a white pickup truck leaving the scene at a high rate of speed." He also testified that "the same truck was seen on every surveillance video" that was reviewed. The truck was shown heading south on Bauer Road, turning west onto Power Plant Road, and then heading south again on Fourth Street. When Detective Flores contacted Maria Torres, Camacho's wife, she was "very upset, crying, emotional, [and] shaking," and she provided relevant evidence in the case.

Detective Flores also testified that Camacho lived less than two miles from Fourth Street and Power Plant Road. After Camacho's vehicle became the suspect vehicle, Detectives Flores and Paradez went to Camacho's home and to Benito Garza's Wrecker Service and Salvage Yard, where Camacho worked, but did not find the vehicle in either location. After Camacho was developed as a suspect, Detective Flores attempted to locate him at his residence on numerous occasions—more than ten times—but found no one at home.

On cross-examination, Detective Flores testified that the pickup on the videotape did not have lights on the top. He received a vehicle identification number (V.I.N.) from

_that a police office told him that "it was an auto versus ped," and according to Mireles, "it matched with what [he] saw." In addition, Ray Fernandez, M.D., the medical examiner who conducted the autopsy on Zarafonitis, testified that the cause of her death was multiple blunt force injuries and the manner of her death was classified as an accident which, in this case, was consistent with being struck by an automotive vehicle._

4

Benito Garza (Garza), Camacho's friend and employer who sold Camacho a white Ford truck, and ascertained that the V.I.N. was from a pickup that belonged to Camacho. When he ran that number through the police office's system, Detective Flores found that the vehicle was a white Ford F-250.

Investigating Officer Paradez testified that after receiving an anonymous call on August 22, 2009, he went to Garza's Wrecker Service in Robstown, Texas and talked with Garza, the owner. He also made contact with Rosendo Del Rio who worked at the wrecker service. Garza informed Detective Paradez that he knew Camacho. He provided Detective Paradez with information on the case, particularly information regarding the vehicle. Detective Paradez also explained that Camacho lived a short distance from where Zarafonitis was hit—only three or four blocks. On August 24, 2009, Camacho's wife was parked at her daughter's house which is located near her own residence. When Defective Paradez made contact with her, she got nervous, started crying, and had relevant information regarding the case. Moreover, Detective Paradez testified that Camacho did not turn himself in; rather, Camacho was found in Del Rio, Texas, in February 2010.

Detective Paradez testified that he, too, reviewed the surveillance video in this case. According to Detective Paradez, the surveillance came from different locations, one video from the Power Plant, a second from the Tower Plant area.[4] In his opinion, the truck shown on the surveillance video was a Ford F-250 and belonged to Camacho; it fit the description of the truck based on the information provided to him by the Texas Crime

---

[4] Without identifying the location, Detective Paradez testified that there was a third camera that took still photos. Those photos do not appear in the record.

Information Center (T.C.I.C.) and by Garza who sold an F-250 to Camacho. On cross-examination, when asked if the truck in the video had "five big yellow lights on top of it," Detective Paradez answered, "Not that I could see." Detective Paradez acknowledged that the witness at the scene claimed the truck was a Chevrolet, but he never looked for a Chevrolet truck because once he saw the video of the truck that fled the scene and was told by some of the utilities workers who were almost hit by that same vehicle that it was a Ford truck, he knew it was not a Chevrolet.

Phillip Richard, who monitored surveillance video at a site close to the scene of the accident, testified that a recording made between 4:00 and 4:30 p.m. on the day of the accident showed a white Ford pickup traveling south, and a second recording showed the pickup turning left from Power Plant Road onto Fourth Street. On cross-examination, Richard testified that a number of farmers and others drive white trucks down Power Plant Road, Bauer, and Magee. Water plant employees also drive white company vehicles, including Chevrolets and Fords. However, according to Richard, the company trucks are marked very noticeably with Nueces County Water Control Improvement District, and he did not see any markings on the truck identified as the suspect vehicle. Richard testified that he could not see a license plate or identify a driver from the videos, but he recalled seeing a single person in the truck on the second video.

Three witnesses who worked for Robstown Utilities came forward after the surveillance footage was shown on the local news. Ricky Guzman, Christopher Garza (Chris), and James Carrillo testified that they remembered passing a truck that approached them from the opposite direction. Guzman testified that around 4:30 on the

6

day of the incident, immediately after he and Chris turned off Fourth Street onto Power Plant Road, he noticed a standard white pickup truck traveling at a high rate of speed on Power Plant Road. Guzman described Power Plant Road as a narrow road with "a lot of potholes and a lot of dips and bumps," i.e., a road on which you would normally drive only fifteen or twenty miles per hour. Guzman saw two people in the truck as it passed his vehicle. He described the driver as an overweight, husky looking "moreno," or dark-skinned Hispanic male, in his late thirties or early forties, who had shaggy, scruffy-looking hair, a full, unkept beard, and a mustache. Guzman also agreed that he had described the driver's hair as "clean cut" in his statement to the police but explained that it was a "typo" and did not know "why they put that on there."

Chris testified that he was traveling with Guzman from their job site when he noticed a white truck coming toward them. According to Chris, the truck, a Chevrolet or a Ford, was "coming real fast, it was kicking up dust," and he told Guzman to "watch out for that truck!" Chris saw two individuals in the truck. He described the driver as a big man, "a little more than chubby," with protruding eyes, a wide nose, a beard, a round chin, short hair, and "somewhere in his forties, over thirty-five for sure."

Carrillo testified that, on August 18, 2009, at 4:30 p.m., he was returning from a job site to the warehouse when he turned off Fourth Street onto Power Plant Road and saw "a vehicle coming at a high rate of speed toward [him] so [he] had to kind of swerve out of the way a little bit to avoid a collision." According to Carrillo, the vehicle was a white Ford pickup and there was nothing unusual about the lighting system. Carrillo saw a dark-complexioned man in the truck. Carrillo testified that he saw the surveillance video

7

when it was aired on the news; it showed his vehicle turning right, another company vehicle ahead of him, and a white vehicle that passed them from the opposite direction. Neither Carrillo, Guzman, nor Chris identified anyone in the court room, including Camacho, as the driver of the suspect vehicle.

Sylvia Quinones testified that she had known Camacho for fifteen years through her family and that he was married to a distant cousin. After seeing the footage on the news, Quinones came forward and gave a statement to the police. Quinones testified at trial that she did not recall giving this statement. She also admitted to having mental problems and being on medication when her statement was given in August 2009. Without objection, however, the prosecutor read Quinones's prior statement into the record. In her statement, Quinones indicated that, when she saw a news story involving the accident and the suspect truck, she "immediately thought that it belonged to a male subject by the name of Rafael Camacho." The defense did not ask for a limiting instruction concerning this statement.

Garza testified that Camacho worked for him "[o]n and off for about 13 years." Garza considered Camacho a friend and sold him a white 2002 Ford three-quarter-ton pickup early in August 2009. When asked if he remembered what Camacho looked like in August 2009, Garza responded, "[H]e looked like what he looks now. . . . He would have facial hair on and off. . . . He would go without shaving for a while and then all of a sudden he'd shave. He might shave his whole head . . . ." Garza testified that Camacho drove the truck every day. According to Garza, on August 18, 2009, Camacho was laying cement for a carport at Garza's home, which is located off of Magee and

8

approximately twenty miles from the water plant. He stated that Camacho worked a full day on August 18 and would usually work until 4:00 or 5:00 p.m., sometimes later. The last time Garza saw Camacho was on August 19, 2009, when Camacho told him that his father, who lived in Mexico, was very ill and that he needed to go see him. Based on this information, Benito assumed Camacho was going to Mexico. Garza testified that Camacho has not worked for him since that day, and his carport is like it was when Camacho left.

On cross-examination, Garza testified that Camacho's truck had five yellow clearance lights on top of the roof the last time he saw it on August 19, 2009. When asked to review the title to Camacho's vehicle and an attached document,[5] Garza testified that "it shows that [Camacho's] vehicle had, it says, 'Roof lights, clearance lamps.'" When shown Defendant's Exhibit 2, an enlarged photograph of the suspect vehicle taken from the surveillance video, Garza testified that the vehicle in the photograph looked "like any Ford truck," he did not "see any clearance lights on that truck," and "[t]hey should be visible on top of the roof." On re-direct, Garza again explained that the clearance lights on Camacho's truck were on the front of the roof—a couple of inches above the windshield on the front of the cab. When asked if he "would agree . . . that there's a possibility that Mr. Camacho removed this lighting system that they think [is] on it?", Garza answered, "I don't think so. I don't agree with you . . . because I would have noticed the lights gone if there is a hole there." Garza also testified that the last time he saw Camacho was "not this weekend, the previous

---

[5] This document, described in the index to exhibits as a detailed vehicle report from Ford Motor Company, was published to the jury but was not offered and admitted as a trial exhibit.

9

weekend" before trial and that he had provided financial assistance to Camacho in the past.[6]

After the State rested and after the trial court denied Camacho's motion for directed verdict, Del Rio testified for the defense. He explained that Defendant's Exhibit 2 did not look like the truck he worked on before it was sold to Camacho because it did not have cab lights and the handle did not open like the one on Camacho's truck. Del Rio explained that he had reviewed the surveillance video with Detective Paradez and had told him that the truck in the video did not look like that truck. Del Rio also testified that Camacho looked the same in court as when he last saw him in June of 2009 except that he did not have a mustache. When asked why he said Camacho did not have a mustache, Del Rio responded that "he always have [sic] a mustache." The State also established that Del Rio had a long friendship with Camacho and that the last time Del Rio spoke with Camacho was a month before trial when they talked for approximately thirty minutes about things other than business.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

In a legal sufficiency review, we consider the entire trial record, viewing the evidence in the light most favorable to the verdict, to determine whether a rational jury could have found the accused guilty of all essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *see Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

---

[6] The Nueces County title registration record for Camacho's 2002 Ford F-250, admitted as State's Exhibit 65, set out that Garza held a first lien on the truck.

This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Padilla v.* State, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010) (quoting *Jackson*, 443 U.S. at 319).

The trier of fact then is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). We "may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the [fact-finder]." *Williams*, 235 S.W.3d at 750. Instead, we resolve any inconsistencies in the evidence in favor of the final judgment and consider whether the jury reached a rational decision. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). An appellate court, faced with a record of historical facts that supports conflicting inferences, must also presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. *Jackson*, 443 U.S. at 326; *Padilla*, 326 S.W.3d at 200.

Legal sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A person commits the offense of failure to stop and render assistance if (1) a driver of a vehicle, (2) involved in an accident, (3) resulting in injury or death of any person, (4) intentionally and knowingly, (5) fails to stop and render reasonable assistance. *See* TEX. TRANSP. CODE

11

ANN. §§ 550.021, 550.023.

The instant conviction rests upon circumstantial evidence. Circumstantial evidence is sufficient evidence to prosecute for failure to stop and render assistance. *Clausen v. State*, 682 S.W.2d 328, 332 (Tex. App.—Houston [1st Dist.] 1984, pet ref'd); *see Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) (en banc) (setting out that the identity of a defendant can be proven by direct or circumstantial evidence). The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9,13 (Tex. Crim. App. 2007). So long as "the verdict is supported by a reasonable inference, it is within the province of the fact[]finder to choose which inference is most reasonable." *Laster*, 275 S.W.3d at 323. And as with any question of circumstantial evidence and inference, "the jurors are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence." *Obigbo v. State*, 6 S.W.3d 299, 306 (Tex. App.—Dallas 1999, no pet.); *see Saenz v. State*, 976 S.W.2d 314, 322 (Tex. App.—Corpus Christi 1998, no pet.) ("Jurors are expected to draw upon their own experiences and common knowledge and apply them to the facts at hand."); *Jones v. State*, 900 S.W.2d 392, 399 (Tex. App.—San Antonio 1995, pet. ref'd). "'[T]he standard of review on appeal is the same for both direct and circumstantial evidence cases.'" *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010).

## II. DISCUSSION

By his sole issue, Camacho challenges the sufficiency of the evidence to support his conviction for failure to stop and render assistance. Specifically, Camacho asserts that no reasonable juror could have found beyond a reasonable doubt that he was guilty of failing to render assistance because there was legally insufficient evidence to prove that he was the driver of the vehicle that struck Zarafonitis. Camacho argues that the evidence is legally insufficient because no witness identified him as the driver of the vehicle that hit Zarafonitis and because there was no eyewitness to the accident.

In this case, although Benavides, the only person who saw a white truck leave the scene, did not see the driver of the truck and none of the witnesses positively identified Camacho, three witnesses at trial provided details about the driver's physical appearance. Guzman testified that the driver had shaggy hair, a scruffy beard and a mustache, and was a husky, dark-skinned Hispanic male in his late thirties or early forties. Chris testified that the driver had a beard, protruding eyes, a wide nose, and that he was a big man, "a little bit more than chubby," with short hair, somewhere in this forties and at least over thirty-five. Carrillo testified that he saw a dark-complexioned man in the truck. In addition, Del Rio, a long time friend, testified that Camacho looked the same in the courtroom as he did in July 2009 when Del Rio last saw him, except that he did not have a mustache and he always had a mustache.

While no witness identified Camacho in court, the law does not require in-court identification, and it is merely one factor to consider in assessing the weight and credibility of a witness's testimony. *Conyers v. State*, 864 S.W.2d 739, 740 (Tex. App.—Houston

13

[14th Dist.] 1993, pet ref'd); *see Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Meeks v. State*, 897 S.W.2d 950, 955 (Tex. App.—Fort Worth 1995, no pet.). Camacho was present in court, and the jurors were free to compare his appearance with the person described by the witnesses, to give probative weight to those observations, and to give effect to the inferences that might reasonably have been drawn from the testimony. *See Obigbo*, 6 S.W.3d at 306; *Jones*, 900 S.W.2d at 399; *see Saenz*, 976 S.W.2d at 322.

Neither does the law require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *see Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). In this case, in addition to the above, the police report, admitted without objection as State's Exhibit 58, provided that Camacho was the driver of the vehicle that struck Zarafonitis and then fled the scene. Once admitted without objection, hearsay enjoys a status equal to that of all other admissible evidence. *See Poindexter*, 153 S.W.3d at 409; *see also* TEX. R. EVID. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay.").

The parties also stipulated that Camacho owned a Ford F-250 white truck, and although there is conflicting testimony regarding the make and model of the suspect vehicle, several witnesses identified the vehicle traveling away from the scene at an unusually high rate of speed for the condition of the road as a white Ford F-250 pickup truck. Detective Paradez, testified that, in his opinion, the truck on the video was a Ford

14

F-250, and based on information he received from the T.C.I.C. and from Garza, the vehicle belonged to Camacho. Furthermore, while Camacho emphasizes the alleged differences between his truck and the truck seen in the surveillance videos, here we are faced with a record of historical facts that arguably supports conflicting inferences, and giving full play to the responsibility of the fact-finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts, we must presume that the jury resolved this conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326; *Padilla*, 326 S.W.3d at 200; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Beckham*, 29 S.W.3d at 151. For instance, it was theorized by the State that the lights on the cab of Camacho's truck could have been removed by Camacho, and based on the evidence before it, the jury could have believed that theory. It is also possible that the jury did not believe Camacho's friends when they testified that Camacho's truck had cab lights. Instead, the jury could have concluded from the testimony of Quinones,[7] the investigating officers, and Carrillo that Camacho's truck was the truck shown on the video and that the truck had no cab lights on the day of the accident.

Moreover, the jury also heard testimony that Camacho lived close to where the accident occurred, and that on August 18, 2009, the day of the accident, he had been working at Garza's home, which was located approximately twenty miles from the water plant. Camacho had worked a full day on August 18 and would sometimes work until

____

[7] Quinones testified that when she saw the news story involving the accident and the suspected truck, she "immediately thought that it belonged to a male by the name of Rafael Camacho." The relevant portion of Quinones's statement was offered into evidence, without instruction or limitation, such that it could have been considered by the jury to be probative as if the witness herself had testified to it in court. *See Poindexter v. State*, 153 S.W.3d 402, 408–09 (Tex. Crim. App. 2005); TEX. R. EVID. 105(a) (providing for the use of a limiting instruction), 802 (setting out the hearsay rule).

4:00 or 5:00 p.m. The accident occurred at approximately 4:30 p.m. that afternoon. Also, immediate flight to another location constitutes suspicious conduct tending to connect the defendant to the accident. *See Gonzalez v. State*, 115 S.W.3d 278, 283 (Tex. App.—Corpus Christi 2003, pet. ref'd) (providing that flight to another city the day after a murder was sufficient to corroborate the testimony of an accomplice). Camacho left for Mexico the day following the accident. He explained to Garza that he was going to Mexico because his father was ill. However, when Camacho was located six months later, he was in Del Rio, Texas, not in Mexico. The timing of his departure is an incriminating circumstance that a rational juror might consider. *See Hooper*, 214 S.W.3d at 13; *also see Guevara*, 152 S.W.3d at 49. Finally, during their investigation, the police found no one at Camacho's home on numerous occasions, and when the police did contact Camacho's wife on one occasion shortly after the accident, she was emotional.

Therefore, considering the entire trial record and viewing the evidence in the light most favorable to the verdict, we conclude the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Hooper*, 214 S.W.3d at 13; *see also Guevara*, 152 S.W.3d at 49. A rational jury could have found beyond a reasonable doubt that Camacho was the driver of the vehicle that hit Zarafonitis and failed to stop and render assistance. *See Jackson*, 443 U.S. at 319; *Laster*, 275 S.W.3d at 517; *Williams*, 235 S.W.3d at 750; *see also* TEX. TRANSP. CODE ANN. §§ 550.021, 550.023. And we must defer to the jury as to that resolution. *See Jackson*, 443 U.S. at 326; *Padilla*, 326 S.W.3d at 200.

We overrule Camacho's sole issue.

16

### III. Conclusion

Accordingly, we affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Do not publish.
Tex. R. App. P. 47.2(b).

Delivered and filed the
23rd day of June, 2011.