**Opinion issued April 15, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00631-CR**

———————————

**JOSE EFRAIN GARCIA DIAZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 482nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1770025**

---

**MEMORANDUM OPINION**

A jury convicted Appellant Jose Efrain Garcia Diaz of the offense of indecency with a child by sexual contact, and the trial court sentenced him to nine years in prison. Diaz filed a motion for new trial, and later an amended motion for new trial, which the trial court denied. In three issues on appeal, Diaz argues (1)

the trial court erred during voir dire by improperly overruling an objection to an improper commitment question by the State, (2) his amended motion for new trial should have been granted because (i) one of the sitting jurors failed to disclose her history as a sexual assault victim and (ii) the jury purportedly considered Diaz's failure to testify during the guilt-innocence phase of trial, and (3) the trial court erred by not permitting him to cross-examine the complainant about her motive in making the assault allegations.

We affirm.

## Background

Appellant Jose Efrain Garcia Diaz ("Diaz") and Marie[1] were in a romantic relationship for approximately two years. During that time, Diaz lived with Marie, her daughter Sophie, and their son Johnny in Marie's apartment.[2] Several years after Diaz moved out of the apartment and the relationship ended, he was arrested and indicted for indecency with a child by sexual contact. *See* TEX. PENAL CODE § 21.11. The indictment identified Sophie as the complainant. It alleged that "on or about December 28, 2012" Diaz "did then and there unlawfully cause [Sophie] a person younger than 17 years of age, to engage in sexual contact, namely by

---

[1]    We use pseudonyms to refer to the child complainant and her immediate family members. *See* TEX. CONST. art. 1, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process"); TEX. R. APP. P. 9.10(a)(3).

[2]    Diaz is not Sophie's father.

2

touching the leg of [Sophie] with the genitals of [Diaz] with the intent to arouse and gratify the sexual desire of [Diaz]."  Sophie was nine years old at the time of the alleged offense.  She was nineteen at the time of trial.

## Voir Dire[3]

During voir dire, the trial court explained the nature of the charges against Diaz and then asked the jury:

> Listening to the charge, I know there might be some people that say that's different than what I thought before, right?  So I need to know is this the type of case that you can be a fair and impartial juror on?  So the question is: Do yourselves either know somebody that has been charged or convicted or a complainant in this type of case?  Without going into the facts, do you know somebody?  And the second question is:  Would you be able to put that situation aside and be a fair juror to both sides?  So we will go row by row.

The trial court then spoke to each of the venire panel members who responded to the question, asking whether each could be a fair and impartial juror in the case, stating, "Without going into the facts of the case, you are saying you would not be able to be a fair and impartial juror to either side?"

The trial court judge also discussed a defendant's Fifth Amendment right not to testify, noting that in her home, her children did not have the right to refuse to answer questions.  She stated:

> . . . Was there ever a situation when you were at home and [your children] were in a different room and you heard them fighting back

---

[3]     We summarize only those portions of voir dire that are pertinent to the parties' arguments on appeal.

3

and forward, bickering, bickering, bickering, and then you hear something break? You run in there, and what do you do?

. . .

You ask what's going on, right? That the natural thing. What if one of them said, Well, I have a Fifth Amendment right not to incriminate me.

. . .

Did anybody have that law in their house where they could just say, No? Right? Because that's just naturally how we do; we want to hear both sides. We want to hear every single bit of information before we make a decision, right?

Again, that crazy law says opposite. We all each have a fundamental Fifth Amendment right not to testify and not to incriminate ourselves in a case.

After asking several jurors about that concept, the judge stated, "It's not your job, right? The burden is with the State, so why would you get up there and try to help the State, right? And what is the benefit of it?" The trial court also noted that speaking in front of groups

is a very terrifying situation. So for that reason, we have a rule that says you cannot take it for—or you cannot consider that as proof of anything. You cannot hold that against somebody if they decide not to testify in this trial.

The trial court told the venire panel members, "[T]his is one of the things that's so important that we are going to have to go individually." Going row by row, the trial court then asked each venire panel member whether the juror "need[ed] to

4

hear or [] w[ould] require the defendant to testify before [being] able to render a verdict."

Also relevant to this appeal, shortly before the conclusion of the State's voir dire, the following exchange transpired:

The State:          Do children lie?  Who thinks children lie?

Jurors:             Yes.

The State:          Yes, I have some.  I know that that is an absolutely fact, right?  Well, which do you think is more common—I'm actually going to ask you on this one.

                    A child denies being sexually abused when they actually were, or a child makes up a completely false allegation of sexual abuse?

Counsel for Diaz:   Judge, may we approach?

The Court:          You may.

(At the Bench, on the record)

Counsel for Diaz:   Judge, he is asking—he is presenting a question to the jurors which, in effect, is asking the jurors to commit on a line of questioning of the way he's going to present his case.  You know, do you think that it's more likely that someone would lie here or lie here.  That's for the jury to decide when the case is presented, but to have them commit right now in front of other jurors is poisoning the jury pool and asking them to make a decision, which is not proper.

|  |  |
|---|---|
|  | He's presenting his case right now by doing that. Not your whole voir dire, but just this one question. I don't think it's appropriate. |
| The Court: | . . . [D]o you have a response? |
| The State: | Judge, my response is I'm not asking them to commit to anything. I'm just giving them two examples of different kinds of lies that could be possible and asking them which one they think is more likely or that happens more often, just in general that has nothing to do with the specific facts of this case. |
| Counsel for Diaz: | I think he can argue that on final argument, but to present it to the jury right now, he's getting—he's moving the jury in a position to position their decision before the evidence comes out. I don't think that's appropriate. |
| The Court: | I'm going to overrule your objection. You can ask the question. |

Voir dire resumed and the State asked the venire panel members the same question and they provided responses.

Following voir dire, a jury of twelve members and one alternate were selected.

## Trial Testimony[4]

### A. Sophie

Sophie testified she was nineteen at the time of trial. She has two younger half-brothers, one of whom, Johnny, was fathered by Diaz. She and her brothers

---

[4] We limit our discussion to testimony relevant to the issue on appeal.

live with their mother, Marie. Sophie's father was deported to Mexico when she was about seven years old.

According to Sophie, she met Diaz when Marie brought him to the apartment when Sophie was about eight years old. Diaz, and later his sister Norma, moved in with them. Sophie viewed Norma as an aunt, and they shared a bedroom. Diaz, Marie, and Johnny shared the other bedroom.

Sophie testified that when Diaz lived with them, she went on errands with him, watched him play soccer, and went to McDonald's with him. She often went out alone with Diaz. During this time, Marie worked at a washateria, and Diaz worked in maintenance. Diaz was with Sophie at the apartment a lot.

According to Sophie, between the ages of eight and twelve, she called Diaz "Dad" because he was "like a father" to her. He helped her get ready for school and picked her up from school, so she told everyone Diaz was her dad and he introduced her as his daughter. She was happy because she "really wanted a dad."

Sophie testified that at some point while Diaz still lived in Marie's apartment, Sophie's relationship with Diaz changed. One day when she was in her room lying on her back on her bed, "[h]e just walked in my room, closed the door and he, he got on top of me. And he would tell me that he was just giving me a hug. But I felt really uncomfortable." When he got on top of her, he spread her legs open. According to Sophie, when this happened, she could feel Diaz's penis

7

on her thighs and leg. He would "do circular motions below his waist." Sophie "was confused. I didn't know what to do. I wanted him off of me." While Diaz touched her on the bed, he told her "that he really loved" her. This occurred while Marie was at work and Norma was in the other room. Sophie believed this happened in 2012.

Sophie testified that Diaz moved out when she was about ten years old. He moved out because Marie and Norma had an argument and Norma decided to leave, so Diaz left also. Sophie testified she was angry at Diaz when he left because he said things that hurt Marie. After moving out, Diaz lived with Norma and her partner in an apartment. According to Sophie, she and Johnny visited Diaz at his apartment every few weekends, and sometimes he picked her up from the babysitter after she was dropped off from school. He sometimes picked her up from school. She went to Diaz's apartment because she "felt like [she] was part of the family." Johnny, who was one year old, and Sophie, who was ten or eleven, slept in Diaz's room when they visited him.

Sophie testified that when she visited Diaz, he "would get on top of [her] and do the circular motions." Johnny was sometimes on the same bed with them when it happened. After Diaz bought her a mattress for her to sleep on, he did the same type of things to her on the mattress. According to Sophie, Diaz told her he missed their hugs and asked if she still loved him. During those encounters, she

8

tried to close her legs, but he opened them and "he would get on top of [her] and would do circular motions" with his genitals. Sophie testified she "was really confused. I didn't know what it meant or why he kept doing it. But I wanted it to stop." She said it continued until she stopped going to his apartment.

According to Sophie, when Diaz abused her, he always called it "hugs." She testified that during her visits, Diaz "would always sexually abuse me and then give me a gift after. He would get on top of me, and then once he was done, he would show me the gifts." Once he gave her a porcelain doll after abusing her. Once after the abuse, he showed her a purse he was going to get her for Christmas.

In all, she described five instances of abuse to the jury, but she said Diaz abused her every time she went to his apartment and they were alone. She did not tell Norma because she (Sophie) "didn't know what was going on" and was "very confused." "At twelve, I knew that it was wrong. I didn't know why. I just felt very uncomfortable."

According to Sophie, when she was around twelve, she stopped visiting Diaz. She woke up from a nap at her apartment, crying, and told Marie that Diaz made her uncomfortable and "was giving [her] hugs." She did not explain in detail what a "hug" meant but told Marie it made her uncomfortable. Nor did she explain in detail what Diaz did to her because she was embarrassed and felt "guilty and gross." Sophie testified that Marie became upset and angry at the disclosure and

9

when Diaz came back to their apartment, she took him and Sophie to the living room to discuss the hugs. Diaz told Marie he just gave Sophie "regular hugs." According to Sophie, he was defensive, and Marie was yelling at him.

In seventh grade, Sophie told her best friend about the abuse. Sophie testified, "I didn't want to believe that I had gotten sexually abused" because Diaz "was still like my father figure." She testified she still thinks of him as a father figure. She did not tell anyone else about the abuse because she was scared her mother or the police would be alerted to the abuse and she "just wanted to grow up, all of us together. I wanted us to have a house and just be happy."

Sophie testified that when she was seventeen, Norma called Marie about the abuse. Marie asked Sophie what happened with Diaz and Sophie told her about the abuse. According to Sophie, she told her mother that Diaz got on top of her and moved in circular motions while on her, but she did not tell her what he said to her or that Johnny was there when it happened because that would have hurt her mother a lot.

According to Sophie, she and Marie decided to make a police report, probably in 2021. They waited until Johnny, who was ten, was in school so he would not find out about the abuse. However, Sophie believed Johnny had some knowledge of what happened because when he was three, she saw him make the same circular motions on his bed that Diaz made when abusing her.

10

Sophie testified she started cutting her wrists and her thighs when she was twelve because she felt guilty for thinking Diaz harmed her. She said the cutting was the result of the sexual abuse by Diaz. She stopped cutting herself when she was eighteen. She also suffered from depression because of the sexual abuse. Sophie went to therapy for a year because of Diaz's abuse. She testified that she had suicidal thoughts because of the abuse. She was diagnosed with severe depression, severe anxiety, and post-traumatic stress disorder, among other things.

Sophie testified that when she was seven years old, before she met Diaz, her babysitter's fifteen-year-old son, Saul, inappropriately touched her when she spent the night there. She woke up to find Saul's hand in her genitals. Sophie told her mother, who became angry and had a conversation with Saul's family. Saul was punished and apologized to Sophie. After the abuse, Marie instructed the babysitter that Sophie was not to be left alone with Saul. The abuse by Saul happened once. Sophie testified that she kept going to that babysitter for a few years.

## B. Marie

Marie, Sophie's mother, testified through an interpreter. She works in a hotel. She has three children: Sophie, Johnny, and a baby. She testified that she met Diaz in 2011, when Sophie was eight. They began to date in November 2011. She thought he was "the perfect man" because he did not drink, smoke, or go out

11

with friends, and he loved his family and children. According to Marie, Diaz moved in with her in March 2012. He paid half the expenses. Eventually Norma moved in too.

Marie testified that Diaz picked up Sophie from school. When Marie was at home, Norma would typically be in her room and Sophie would typically be in Diaz's bedroom because he "supposedly was taking care of" her. Marie often saw Diaz give Sophie a hug like a daughter and he hugged the boys also. She thought he was a good father. Marie did not notice anything strange about the relationship between Diaz and Sophie when they lived together.

After Diaz moved out, Sophie initially visited him every day. Diaz picked up Sophie and Johnny from the babysitter.

According to Marie, when Sophie was twelve, she made a disclosure of sexual abuse to Marie. Marie, Sophie, and Johnny were in the house at the time, though Johnny was in the bedroom. Sophie came into the kitchen crying. Marie testified that Sophie "wouldn't stop crying." Sophie told her she did not "want to go anymore" with her "dad" (Diaz). Marie testified, "She told me that when he saw her . . . he would say that he had missed her a lot and that he used to hug her when he's—when her brother was asleep." Marie testified she thought there might have been sexual abuse, or alternately that Sophie was "confused." Marie testified

that at that point, she was "doubtful" that there was sexual abuse, so she did not pursue legal action.

In response to the allegation, she spoke with Diaz and Sophie at the same time because she thought neither of them could lie to her. When she met with them, the first thing Marie said to him was that he was sexually abusing her daughter, because she believed Sophie, even though Sophie was confused. Diaz said he would never do something like that because he loved Sophie "like she was his daughter." Marie believed Diaz. Sophie was "very afraid" during the meeting. By that time, Diaz already had moved out of the apartment, approximately two years prior. Sophie stopped going to Diaz's house after she told her mother about the "hugs."

According to Marie, Sophie changed after that. She "didn't want to share with us" and wanted to "go and stay in her bedroom" and "wouldn't want to eat and she had a lot of trouble with nutrition." Marie found out Sophie was cutting herself and attributed that to the sexual abuse by Diaz. Around that time, Marie saw letters Sophie was writing about committing suicide.

Marie testified she did not call the police until after a four-hour telephone conversation with Norma when Sophie was seventeen. According to Marie, Norma told her she found Diaz "on top of" Sophie in his bedroom. After Marie's conversation with Norma, Marie told Sophie to tell her "the whole truth about the

13

hugs." Sophie cried and told her that Diaz "would get on top of her and separate her legs and he would move in a motion, circle motion." She also said he would kiss her neck and say that he missed her a lot and that he had gifts for her. According to Marie, this began when Sophie was nine.

After talking to Norma, Marie and Sophie went to the police station in Conroe, Texas and ultimately reported the abuse to Harris County law enforcement authorities. After that, Sophie began therapy, because she was still thinking about suicide and had attempted "many times." Marie testified she felt guilty because five years prior when Sophie first told her, she was "unable to do anything about it" because she "had doubts whether he had done it or not." But she had no doubts that after talking to Norma that the abuse occurred.

Marie still had custody of Johnny during trial. She told Diaz after going to the police that he could not see Johnny again. At the time of trial, Marie was in litigation with Diaz regarding his visitation rights with Johnny.

According to Marie, Sophie said that Saul had touched her on her leg in her "private part area." Although Marie believed Saul had acted inappropriately, she continued to take Sophie there because Marie spoke with Saul's mother soon after it happened.

## C. Norma Garcia

Norma Garcia, who testified through an interpreter, is Diaz's sister. She

testified she has known Sophie since Sophie was seven. When Norma arrived in the United States in 2012, she moved in with Diaz, Marie, Sophie, and Johnny. She lived with them for a year.

According to Norma, Sophie never told her she was scared of Diaz or that he did anything inappropriate to her. She testified she never had a four-hour conversation with Marie and never told Marie that she saw Diaz on top of Sophie. She never saw any inappropriate contact between Diaz and Sophie. Norma said Diaz treated Sophie "[n]ormal, just like a father with a daughter."

According to Norma, Marie's relationship with Diaz ended "very bad[ly]" in 2013. Norma testified that Marie had a "horrible" temper, was "very violent," "jealous to an extreme," and threatened Diaz, saying she would "ruin [his] life." On one occasion, Marie grabbed her own neck and told him to hit her, and she hit herself. The police were never called after the fights between Marie and Diaz, and to Norma's knowledge, Marie never filed charges for domestic violence against Diaz.

Norma did not believe Sophie cut herself, and she never heard that she had done so or saw scarring or cut marks on her wrists. Sophie never told her she was abused physically or sexually but Norma heard Marie tell Diaz that someone named Saul touched her. She believed Saul abused Sophie.

Norma testified she was called twice by a detective to discuss the case against Diaz. She told the detective she cut off communication with Marie when she moved out.

She said Sophie had "psychological problems." She last saw Sophie and Johhny eight years before trial.[5]

Diaz did not testify on his own behalf during the guilt-innocence phase of trial.[6]

## Jury Charge

When the trial court read the charge to the jury, the State pointed out that the court had not read the instruction about the defendant's right not to testify. The trial court judge stated she had accidentally taken that page out of the charge. She then read the following instruction to the jury:

> Ladies and Gentlemen of the jury, there's an additional charge that I forgot to read to you. I apologize for that. The next paragraph, it reads: Our law provides that a defendant may testify in his own behalf if he elects to do so. This however is a right afforded a defendant. And in the event he elects not to testify, the fact cannot be taken as a circumstance against him.
>
> In this case the defendant has elected not to testify and you are instructed that you cannot and must not refer to or allude to that fact

---

[5] Whitney Crowson, a clinical psychologist at the Children's Assessment Center, and Houston Police Department Detective Miriam Gonzalez also testified at trial. Their testimony is not relevant to the issues on appeal.

[6] Norma was the only witness called by the defense during the guilt-innocence phase of trial.

16

throughout your deliberations or take into consideration for any purpose whatsoever as circumstance against him.

After the court read the instruction to the jury, the parties made their closing arguments.

The jury found Diaz guilty of indecency with a child by contact. After the jury verdict was read, with the permission of the court, both prosecutors for the State and defense counsel and his paralegal assistant visited with the twelve-person jury. The following day, the trial court judge proceeded with the sentencing phase of trial.

## Punishment Phase

The punishment phase of trial was tried to the bench. Before commencing, defense counsel informed the court that during the lawyers' visit with the jury after the verdict was read, he asked the jurors if there was anything he could have done different or better. According to defense counsel, a female juror said, "[W]ell we were all wondering why you didn't call the defendant to testify. It made him look guilty." Defense counsel said the statement

> basically meant that, at least that juror and maybe others because she used the word we, either discussed the fact that the defendant did not testify or considered the fact that he didn't testify as some indication of guilt in direct violation of [the court's] orders.

17

The trial court asked whether the juror had stated "they took it in consideration or [merely] ask[ed] why didn't you?", to which defense counsel responded, "No. She said we took it into consideration." At that point, the State interjected, stating:

> She never said that, Judge. She asked why they didn't call the defendant. She also never said it made him look guilty. She said why—we were just wondering why you didn't call the defendant. . . . But they were just asking why the defendant didn't get called. She never said that it made him look guilty and they never said that they took that into consideration when—during their deliberations.

The court concluded that because the juror was not present and she did not know what was actually said, there was nothing she could do at that point. She told defense counsel that he could file a motion for new trial and "we can take it up at that point." The court then proceeded with the punishment phase of trial.

After hearing testimony and closing arguments from counsel, the trial court imposed a punishment of nine years in prison.

### The Motions for New Trial

Diaz filed a timely motion for new trial complaining about the female juror's comment concerning his failure to testify. In the motion, he quoted the unnamed juror ("Jane Doe") as having said, "We were wondering why you didn't put your client on the stand. It made him look guilty."

Defense counsel averred in his motion for new trial that he attempted to contact all twelve jurors[7] and he was able to speak with two of them. The first juror with whom he spoke told him that while she remembered "a statement to that effect," Diaz's failure to testify "was not discussed openly or taken as a circumstance against him during jury deliberations." The second juror told him he remembered the statement but that Diaz's failure to testify did not play any role in the jury's deliberations. Defense counsel argued in the motion that his interviews with the two jurors "serve[d] as strong evidence that outside influence [had] in fact occur[ed] in one form or another," even though both jurors stated that the failure to testify "was not taken as a circumstance against the Defendant nor was it discussed during jury deliberations." He concluded that juror misconduct had occurred, the misconduct was material, and it "almost certainly resulted in harm" to Diaz.

Defense counsel attached an affidavit from his paralegal assistant to the motion for new trial. The paralegal was present when Jane Doe allegedly made the statement. In his affidavit, the paralegal repeated the alleged statement Jane Doe made while talking to counsel for both parties, and he described the conversations defense counsel had with the two jurors he contacted after the trial.

---

[7]  Diaz filed a "Motion to Unseal Jury Summons, Jury Roster and Juror Information Sheets," which the trial court granted. This enabled defense counsel to contact the jurors.

On July 17, 2023, fifty-four days after the trial court signed the final judgment of conviction, Diaz filed a first amended motion for new trial. In addition to the arguments made in his original motion for new trial, Diaz claimed that, according to a third juror interviewed by telephone, Jane Doe told the jury foreperson in the presence of the entire jury "that she had been sexually abused as a child and had never confided this information to anybody, not even a family member." She purportedly shared this comment with the foreperson before the jury reached its verdict. According to Diaz, the third juror also shared with his defense counsel that Jane Doe "indicated that because of said childhood sexual abuse she wasn't sure if she couldn't be fair and impartial in rendering a verdict in the case [that is] the subject of this motion." (Emphasis omitted.) Diaz argued that Jane Doe had committed "extreme juror misconduct [that] certainly falls under the umbrella of 'outside influence.'" He argued:

> Even if Judge Nelson did not strike Juror Jane Doe for cause, the Defense certainly would have used one of their peremptory strikes to remove Juror Jane Doe from the jury pool. Not only was Juror Jane Doe admittedly sexually abused by an unknown person as [a] child (therefore making her biased), but she stayed silent about it during Voir[] Dire and then later admitted to the Jury Foreman in the presence of the entire jury that she was sexually abused as a child and wasn't sure if she could be fair and impartial to both sides in rendering a verdict in this case.

He argued that juror misconduct had occurred, that it was material, and that it "almost certainly" resulted in harm to Diaz. The same affidavit attached to the

20

original motion for new trial and the reporter's record from voir dire were attached to the amended motion.

In response to the motions for new trial, the State first argued that Diaz was barred under Texas Rule of Evidence 606(b) "from presenting testimony or other evidence offered to impeach a verdict except when it pertains to an outside influence that is brought to bear on the jury."[8]  The State explained that a Rule 606(b) inquiry "is limited to that which occurs outside the jury room and outside of the juror's personal knowledge and experience."  The State posited that neither statement from Jane Doe qualified as an outside influence.

The State next argued that Diaz had not established juror misconduct because he had not demonstrated that any purported outside influence "had a

---

[8]     Texas Rule of Evidence 606, entitled "Juror's Competency as a Witness," provides in pertinent part:

> **(1)**   ***Prohibited Testimony or Other Evidence.*** During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
>
> **(2)**   ***Exceptions.*** A juror may testify:
>
>> **(A)**   about whether an outside influence was improperly brought to bear on any juror; or
>>
>> **(B)**   to rebut a claim that the juror was not qualified to serve.

TEX. R. EVID. 606(b).

21

prejudicial effect on the 'hypothetical average juror.'" The State claimed that the affidavit attached to Diaz's motions contained hearsay statements allegedly made by various jurors, and that the only "remotely admissible statement" in the affidavit was that of Jane Doe, who according to Diaz, said, "We were wondering why you didn't put your client on the stand. It made him look guilty." But the State disputed that Jane Doe had made that particular statement. The State attached an affidavit from one of the prosecutors present when Jane Doe made the alleged statement, and according to the prosecutor's affidavit, Jane Doe only asked counsel for Diaz "why he did not call his client to testify." According to the prosecutor,

> I along with [another prosecutor] were present in the jury room after [Diaz] was found guilty . . . I do recall the juror in question asking counsel for the Defendant why he did not call his client to testify. However, I do not recall overhearing the juror state, "it made him look guilty" or any words to that effect.
> . . .
>
> . . . I also do not recall the juror using the word "We" when asking the question. To the best of my knowledge, the juror stated, "Why didn't you call him to the stand?" I also do not recall any other juror in the room confirming, agreeing or reinforcing the juror's question.

Even if Jane Doe's statement was made as reported by Diaz's counsel, the State argued there was no evidence the statement had affected the verdict, especially given that the jurors with whom defense counsel spoke told him that Diaz's failure to testify was not discussed during deliberations and the purported statement by Jane Doe did not affect the verdict.

22

Finally, the State argued that the purported statement from a juror about her sexual abuse was hearsay because it was a statement "made to the assistant to [d]efense counsel by a juror recounting a conversation that he allegedly heard between an unidentified juror and the [f]oreman." In addition, the State argued the juror had not stated she could not be fair and there is no evidence that the statement, even if made, was "part of the jury's deliberations."

During the hearing on the motion for new trial, defense counsel restated his Fifth Amendment argument from his motions for new trial. The trial court held there would be no testimony on the Fifth Amendment issue:

> I don't think the Fifth Amendment issue is something that I can hear from the jurors about. I believe that I'm sure that the jurors that ended up on the jur[y] all said during jury selection admittedly—and for the record, I have not read the transcript—that they could play ball with the Fifth Amendment and then post trial ask you a question and suggest that it made your client look guilty. But it doesn't sound like anybody said that that's why they convicted is because he didn't testify.

Defense counsel also argued during the hearing that one of the jurors (now identified as Juror No. 8) had "lied by omission" and that he would have struck her had he known she had been sexually assaulted. He argued the trial court specifically inquired from the venire panel members whether they themselves or someone they knew "had been charged or convicted or [been] a complainant in this type of case" and whether they "would be able to put that situation aside and be a fair juror to both sides?" And that in response to such inquiry, Juror No. 8 had

23

remained silent.  The State responded that it was not clear based on the court's specific question that Juror No. 8 had lied during voir dire, because "[i]f you look at the question that was actually asked, it is not necessarily clear that the Judge [wa]s specifically asking for your personal experience."  While the question touched on the issue, there were "a lot of very specific words in there like 'complainant' and 'defendant.'"  The State continued, "I can see even a reasonable juror not truly understanding that that is asking for them to talk about their own personal experience especially if they've never told it to anyone before."

The trial court held Juror No. 8 could testify during the hearing.  Juror No. 8 testified that she did not hear the trial court ask whether any member of the venire panel had been a victim or a complainant in a sexual abuse case as a child.  She testified:

> No.  That wasn't exactly the question [the trial court] asked.  She asked if you had known somebody or been in that situation and you therefore would have a bias and could not correctly judge someone involved in that issue.  That is what I heard her ask, yes.

The juror testified she did not raise her hand in response to the question because she believed that even though she had been sexually assaulted as a child, "that would not hinder [her] ability to be fair in the trial, which was the question [the trial court] asked."  She said the incident had occurred more than fifty years ago, she did not seek psychiatric or psychological treatment as a result, law enforcement

was not involved, and she did not have any unresolved issues because of the assault.

Juror No. 8 also testified about her statement to the jury foreperson:

I told him that I was a holdout because I wanted—I had had that experience when I was young, and I wanted to make sure that I thought the whole thing through and it was not at all being biased to the defendant. And that's why I wanted them to know because I was one of the three holdouts for him, not against him.

She disputed telling the foreperson she was not sure if she could be "fair and impartial to both sides." She also testified she had confided in her husband and "a couple other people" prior to telling the jury foreperson. She did not tell the other jurors any specifics about her sexual abuse. She testified she gave Diaz a fair trial and her verdict was not the result of her own experience.

Following the testimony from Juror No. 8, the court indicated she would not hear from any other jurors. At the conclusion of the hearing, defense counsel made a bill of exception involving another juror. That juror testified that Juror No. 8 said in the jury room during trial that "she was sexually abused as a child. And the other thing she said is she was surprised that she could be on a trial like that." The juror stated she did not hear Juror No. 8 say she could not be fair and impartial.

The trial court signed an order denying the motion for new trial on August 7, 2023. This appeal ensued.

**Commitment Question**

In his first issue, Diaz argues the trial court erred during voir dire by overruling his objection to what he contends was an impermissible "commitment" question from the State.

## A. Standard of Review

Commitment questions "require a venireman to promise that he will base his verdict or course of action on some specific set of facts before he has heard any evidence, much less all of the evidence in its proper context." *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005). "An improper commitment question attempts to create a bias or prejudice in the venireman before he has heard the evidence, whereas a proper voir dire question attempts to discover a venireman's preexisting bias or prejudice." *Id.*; *see also Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001) (stating that commitment questions "are those that commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact"); *Davis v. State*, 349 S.W.3d 517, 518 (Tex. Crim. App. 2011) (same). We review a trial court's ruling during voir dire on an alleged improper commitment question for an abuse of discretion. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002); *Mendez v. State*, 612 S.W.3d 443, 446 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd); *see also Jacobs v. State*, 560 S.W.3d 205, 210 (Tex. Crim. App. 2018) ("The Supreme

Court of the United States has long held that a trial judge has broad discretion in the manner it chooses to conduct voir dire, both as to the topics that will be addressed, and the form and substance of the questions that will be employed to address them.") (internal citations omitted).[9]

## B.    The Voir Dire Question

During voir dire, the following exchange occurred between the State and the venire panel members:

| | |
|---|---|
| The State: | Do children lie?  Who thinks children lie? |
| Jurors: | Yes. |
| The State: | Yes, I have some.  I know that that is an absolutely fact, right?  Well, which do you think is more common—I'm actually going to ask you on this one. |
| | A child denies being sexually abused when they actually were, or a child makes up a completely false allegation of sexual abuse? |

Defense counsel objected to the question, arguing that the prosecutor was "asking the jurors to commit on a line of questioning of the way he's going to present his case. . . . That's for the jury to decide when the case is presented, but to have them commit right now in front of other jurors is poisoning the jury pool and asking

---

[9]     *See also Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App. 2012) ("A trial court retains discretion to restrict voir dire questions that are confusing, misleading, vague and broad, or are improper commitment questions.") (citing *Barajas v. State*, 93 S.W.3d 36, 38–39 (Tex. Crim. App. 2002)).

them to make a decision, which is not proper." The trial court overruled the objection.

On appeal, Diaz argues the question sought a "commitment from the venire panel because it present[ed] the hypothetical, but exceedingly likely, prospect that the [c]omplainant's veracity [was] going to be called into question." Diaz argues the question was "designed to encourage the jury to assume that the complainant [was] not fabricating an allegation of sexual abuse."

The State responds that the question is not an improper commitment question, and it points to this Court's opinion in *Mendez v. State* where we analyzed virtually the same voir dire question and held it was not a commitment question. 612 S.W.3d 443 (Tex. App.—Houston [1st Dist.] 2020, pet ref'd). In *Mendez*, the defendant appealed his conviction for continuous sexual abuse of a child younger than fourteen years of age. 612 S.W.3d at 445. The *Mendez* opinion quotes the relevant part of voir dire:

> The State then asked each venire person to choose which statement they believed to be more common: (1) "[a] child denies being sexually abused when they actually were[;]" or (2) "[a] child makes up a false allegation of sexual abuse."

*Id*. at 447. Like Diaz, the appellant in *Mendez* objected to the question, arguing it was an improper commitment question because the State "seems to be trying to—in a roundabout way of basically saying or trying to figure out—put people in a box and say, [']Will you believe them or will you not believe them?[']" *Id*. at

28

447–48. The State argued it had not posed a commitment question but, rather, asked a question to solicit the venire panel's "general, gut opinion regarding the subject of whether a child could be found credible." *Id.* at 448. The trial court overruled the objection, and the State asked each panel member which statement each person believed was more common. *Id.* In affirming the trial court's ruling allowing the question, we held the State's question

> did not ask any venire person to resolve or refrain from resolving an issue a certain way after being informed of a particular set of facts, but merely asked whether the venire members believed children were more likely to deny that sexual abuse had occurred when it actually did occur or were more likely to fabricate allegations of sexual abuse.

*Id.* We relied on our opinion in *McDonald v. State*, 186 S.W.3d 86 (Tex. App.—Houston [1st Dist.] 2005, no pet.), in which the defendant was indicted for aggravated sexual assault of a child. In *McDonald*, we held the State's question to a venire panel—"Do you feel that children likely will make up sexual abuse or unlikely?"—was not a commitment question because it "[did] not ask the venire members to resolve, or to refrain from resolving, an issue a certain way after being informed of a *particular* set of facts" but rather "merely ask[ed] the prospective jurors whether they [thought] it [was] likely or unlikely that children *generally* will fabricate allegations of sexual abuse." 186 S.W.3d at 90 (emphasis in original). We explained in *McDonald* that "[a]n improper commitment question attempts to create a bias or prejudice in the venireman before he has heard the evidence,

whereas a proper voir dire question attempts to discover a venireman's preexisting bias or prejudice." *Id.* (quoting *Sanchez*, 165 S.W.3d at 712).

Consistent with our opinion in *Mendez* and *McDonald*, we hold the State's voir dire question was not an improper commitment question because it attempted to discover "whether any of the prospective jurors harbor a pre-existing bias or prejudice concerning the likelihood of children in general fabricating sexual abuse allegations." *Mendez*, 612 S.W.3d at 448; *see McDonald*, 186 S.W.3d at 90.

We note that the case on which Diaz relies, *Standefer v. State*, 59 S.W.3d 177 (Tex. Crim. App. 2001), supports our holding.[10] As we pointed out in *Mendez*, the Court of Criminal Appeals in *Standefer* "approved a similar 'question in a child-molestation case [that] inquire[d] whether the juror believe[d] that no child could/would lie about such a thing[.]'" *Mendez*, 612 S.W.3d at 448 (citing *Standefer*, 59 S.W.3d at 183 n.28 (citations omitted)). We held in *Standefer* that the question fell "within the exception to the usual prohibition against commitment questions." *Standefer*, 59 S.W.3d at 183 n.28.

We overrule Diaz's first issue.

## Motion for New Trial

In his second issue, Diaz argues the trial court abused its discretion in denying his motion for new trial because there was (1) improper bias based on a

---

[10] Diaz does not address *Mendez* or *McDonald* in his appellate brief.

juror's comment about Diaz's failure to testify, and (2) outside influence and improper bias based on the undisclosed sexual assault of another juror.[11] We address each argument in turn.

## A.    Standard of Review

The trial court's decision to deny a motion for new trial is reviewed for an abuse of discretion. *Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024) (citing *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017)). "[W]e do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." *Becerra*, 685 S.W.3d at 127 (citing *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014)). An abuse of discretion occurs when "no reasonable view of the record could support [the trial court's] ruling." *Id.* (citing *Burch*, 541 S.W.3d at 820). The trial court is the sole judge of the credibility of the evidence proffered in support of a motion for new trial. *Id.*; *see Najar v. State*, 618 S.W.3d 366, 372 (Tex. Crim. App. 2021) (holding the reviewing court applies "a uniformly deferential standard of review to

_____

[11]    It is unclear from the record and the parties' briefs whether the same juror made the comment about Diaz's failure to testify and the previous sexual assault, or whether the statements were made by two separate jurors. In his motions for new trial, Diaz identifies the same juror, Jane Doe, as making both statements. In his brief, though, he identifies the juror who made the comment about Diaz's failure to testify as "one [unidentified] juror" and the juror who made the comment about a sexual assault first as "Jane Doe" and later as "M.O." The State refers to the juror who made the comment about Diaz's failure to testify as "Jane Doe" and to the juror who made the comment about her sexual assault as "Juror No. 8." For clarity's sake, we adopt the identifications used by the State.

a trial court's finding in ruling on a motion for new trial"); *Barnett v. State*, 847 S.W.2d 678, 679 (Tex. App.—Texarkana 1993, no pet.) ("The determination of a motion for new trial based on alleged jury misconduct is within the sound discretion of the trial judge."); *Sneed v. State*, 670 S.W.2d 262, 266 (Tex. Crim. App. 1984) ("[I]ssues of fact as to jury misconduct raised at a hearing on [a] motion for new trial are for the determination of the trial judge, and where there is conflicting evidence there is no abuse of discretion where the motion for new trial is overruled.") (citing cases).

## B.     Undisclosed Sexual Assault

Diaz argues on appeal he is entitled to a new trial based on two grounds related to Juror No. 8's alleged sexual assault. He argues that Juror No. 8's failure to disclose her sexual assault during voir dire and her later disclosure in the jury room concerning her sexual assault constitutes "other evidence" under Rule of Appellate Procedure 21.3(f) and "outside influence" under Rule of Evidence 606(b). Diaz further argues that Juror No. 8's disclosure created improper bias against Diaz.[12]

---

[12]     The State argues the trial court properly denied Diaz's amended motion for new trial on the grounds related to Juror No. 8 because those grounds were untimely. To the extent the State complains now of the untimeliness of the amended motion for new trial, we note the State failed to object to the amended motion for new trial either in its response or during the hearing. Any objection to the timeliness of the amended motion for new trial was thus waived. *See State v. Moore*, 225 S.W.3d 556, 569 (Tex. Crim. App. 2007) (noting trial court has "authority to entertain

## 1.     Other Evidence/Outside Influence

Diaz argues that he is entitled to a new trial pursuant to Rule of Appellate Procedure 21.3. Rule 21.3 provides that a defendant "must" be granted a new trial

> when, after retiring to deliberate, the jury has received other evidence; when a juror has talked with anyone about the case; or when a juror became so intoxicated that his or her vote was probably influenced as a result[.]

TEX. R. APP. P. 21.3(f). Diaz argues that Juror No. 8's previously undisclosed sexual abuse was "other evidence" not brought up during voir dire or during trial, which "touches on the character of the evidence presented during trial." Diaz also argues that Juror No. 8's sexual assault constitutes an "outside influence" under Rule of Evidence 606(b). Rule 606(b) provides that a juror may not testify about "any statement made or incident that occurred during the jury's deliberations, the effect of anything on that juror's or another juror's vote, or any juror's mental processes concerning the verdict of indictment" except that a juror may testify "about whether an outside influence was improperly brought to bear upon any juror" or "to rebut a claim that the juror was not qualified to serve." TEX. R. EVID. 606(b).

The Court of Criminal Appeals has defined "outside influence" in the context of allegations of juror misconduct as "something originating from a source

---

even a late-filed amended motion for new trial within [seventy-five days after imposition of sentence], absent an objection from the State," and State can forfeit its objection by inaction).

outside of the jury room *and* other than from the jurors themselves." *Colyer*, 428 S.W.3d at 125 (citing *McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012) (emphasis in original)). In other words, "a juror's personal experiences do not constitute 'outside influence' for the purposes of a Rule 606(b) inquiry." *Ex parte Parra*, 420 S.W.3d 821, 827 (Tex. Crim. App. 2013) (citing *McQuarrie*, 380 S.W.3d at 153).[13]

Because the information about which Diaz complains concerns Juror No. 8's personal experience which she purportedly shared with the foreperson of the jury, the information does not qualify as "other evidence" under Rule 21.3 or improper "outside influence" under Rule of Evidence 606(b). *See In re S.P.*, 9 S.W.3d 304, 308 (Tex. App.—San Antonio 1999, no pet.) ("An outside influence must emanate from outside the jury and its deliberations, such as a non-juror introducing information to the jury."); *Najar*, 618 S.W.3d at 374–75 (noting "a 'passing remark' would not qualify as other evidence. Furthermore, jurors are entitled to draw from their general life experiences when evaluating the evidence").

---

[13]    In *Ex parte Parra*, an appellant who was convicted of sexual assault of a child claimed his counsel rendered ineffective assistance by failing to properly voir dire a juror to discover she was the victim of domestic abuse and sexual assault of a child. 420 S.W.3d 821, 826 (Tex. Crim. App. 2013). Relying on Texas Rule of Evidence 606(b), the Court of Criminal Appeals refused to consider the affidavit of a juror who alleged that another juror claimed during deliberations to have been sexually abused as a child. *Id.* at 826.

Even if the information could be construed as "other evidence" or "outside influence," Diaz would not prevail. Diaz must establish that "other evidence" had a detrimental impact on the defendant or that "outside influence" "was improperly brought to bear" with an intent to influence a juror. *See Colyer*, 428 S.W.3d at 12 (holding that "an 'outside influence' is problematic only if it has the effect of *improperly* affecting a juror's verdict in a particular manner—for or against a particular party") (emphasis in original); *Saenz v. State*, 976 S.W.2d 314, 323 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.) (holding that regardless of whether the discussion from the juror was "other evidence" as defined by Texas Rule of Appellate Procedure 21.3(f), appellant could not prevail because he "failed to show any detrimental impact."). And he must establish the effect the outside influence would have had on the hypothetical average juror. *Colyer*, 428 S.W.3d at 129–30 (explaining question is not effect information had on particular juror). Diaz established neither. There is no evidence there was any "detrimental impact" from Juror No. 8's mention of her sexual assault or that an "outside influence" was "improperly brought to bear upon any juror." That is, there is no evidence any jurors considered Juror No. 8's reference to her sexual assault in reaching their verdict. Indeed, Juror No. 8 testified during the hearing on Diaz's motion for new trial that she originally was one of three "holdouts" in favor of Diaz:

> I told [the jury foreperson] that I was a holdout because I wanted—I
> had had that experience when I was young, and I wanted to make sure

35

that I thought the whole thing through and it was not at all being biased to the defendant. And that's why I wanted them to know because I was one of the three holdouts for him, not against him.

She testified she did not tell the foreperson she was not sure if she could be "fair and impartial to both sides" or tell the other jurors any specifics about her sexual abuse, and she gave Diaz a fair trial.

At the conclusion of the hearing on the motion for new trial, defense counsel made a bill of exception for another member of the jury who was not permitted to testify at the hearing. That juror testified that Juror No. 8 stated in the jury room during trial that "she was sexually abused as a child. And the other thing she said is she was surprised that she could be on a trial like that." The juror did not hear Juror No. 8 say she could not be fair and impartial.

Neither Juror No. 8's testimony nor the bill of exception establish that Juror No. 8's undisclosed sexual abuse was "other evidence" as that term is defined by Texas Rule of Appellate Procedure 21.3(f) or an "outside influence" as contemplated by Rule 606(b)(2).[14] The trial court thus did not err in denying

---

[14] Diaz argues that Juror No. 8's previously undisclosed sexual assault was more than a "passing remark" but was distinguishable from the "'general life experiences' from which jurors are entitled to draw when evaluating the evidence." But he does not cite any authorities that explain how the assault was more than a passing remark or is distinguishable from general life experiences. The 1924 case he relies on does not support his position. *See Frazer v. State*, 99 Tex. Crim. 89, 91–92, 268 S.W. 164, 166 (1924) (holding jurors' discussion during deliberations in murder case of their personal knowledge regarding gunpowder burns and trajectory of bullet based on jurors' "different experiences in

Diaz's motion for new trial on this basis. *See Saenz*, 976 S.W.2d at 321–23 (holding defendant was not entitled to new trial under Rule 21.3 even though he had presented evidence that juror had discussed his personal experience as gang member with jury in murder case involving fourteen-year old gang-member, and that five members of jury with firearm experience had "educated" remaining members of jury "who, presumably lacked that experience" because defendant did not show any detrimental impact);[15] *see also Mata v. State*, 517 S.W.3d 257, 268 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd) (holding trial court did not abuse discretion in denying motion for new trial based on juror misconduct allegations because neither juror's discussion about his experience working as jail

---

life" did not constitute "the introduction of any testimony, or the bringing into the case of any new or hurtful fact").

[15] In holding the trial court did not abuse its discretion in overruling the defendant's motion for new trial, the court of appeals stated:

> The former gang member did not represent himself as an expert on gangs, nor did he endeavor to tie his own experiences in with any particular aspect of the trial. None of the jurors paid any special attention to his comments, and none considered them in reaching their verdict. The juror's comments appear to have been in the nature of a casual remark. The determination of whether a jury has "received" other evidence is a question of degree, and a passing remark will not constitute receipt of other evidence.

*Saenz v. State*, 976 S.W.2d 314, 322 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.) (citing *Baldonado v. State*, 745 S.W.2d 491, 495 (Tex. App.—Corpus Christi-Edinburg 1988, pet. ref'd)). Similarly, concerning the statements from the five jurors regarding their firearm experience, the court held the trial court had not abused its discretion in denying the motion for new trial because even had there been influence on the other jurors by those who knew about firearms, there was "no evidence in the record that any juror changed his or her decision based on the discussion of the shell casings." *Id.* at 323.

guard nor other juror's discussion about her spouse being a felon "and how the respective experiences impacted the jurors' positions on punishment" was "outside influence" as contemplated by Rule 606(b)).

### 2. Bias

Next, Diaz argues the trial court erred "by failing to investigate [Juror No. 8's] improper bias." He contends Juror No. 8 withheld material information during voir dire, denying him the opportunity to exercise his challenges. The State responds that Diaz did not exercise due diligence in uncovering Juror No. 8's sexual abuse history, and that in any event, Juror No. 8 reasonably interpreted the trial court's voir dire question to be one regarding partiality, and she did not withhold information in failing to reveal her past sexual abuse.

"When a juror withholds material information during voir dire that the defense, using due diligence, could not uncover, the parties are denied the opportunity to exercise their challenges, which hinders their selection of an impartial jury." *State v. Gutierrez*, 541 S.W.3d 91, 99–100 (Tex. Crim. App. 2017). The Court of Criminal Appeals has noted that at least one court of appeals "has held that this is a violation of a defendant's right to an impartial jury." *Id.* (citing *Franklin v. State*, 23 S.W.3d 81, 82 (Tex. App.—Texarkana 2000, no pet.). But the withholding of information in and of itself is not sufficient reason for reversal. *Id.* at 100. The defendant must also have been harmed by the juror's

38

omission. *Id.* (citing *Franklin v. State*, 138 S.W.3d 351, 355–56 (Tex. Crim. App. 2004)). If the trial court determines the juror is not "actually biased," and that finding is supported by the record, "then the defendant has not been harmed by the violation of his constitutional right to an impartial jury." *Id.* (citing TEX. R. APP. P. 44.2(a) (stating constitutional error not harmful if reviewing court finds beyond reasonable doubt that error did not contribute to conviction)).

During voir dire, after explaining the nature of the charges against Diaz, the trial court asked the jury:

> Listening to the charge, I know there might be some people that say that's different than what I thought before, right? So I need to know is this the type of case that you can be a fair and impartial juror on? So the question is: Do yourselves either know somebody that has been charged or convicted or a complainant in this type of case? Without going into the facts, do you know somebody? And the second question is: Would you be able to put that situation aside and be a fair juror to both sides?

The trial court went row by row and spoke with the venire panel members who responded to the question, asking whether each could be a fair and impartial juror in the case. Juror No. 8 did not reveal her previous sexual assault or otherwise respond to the question. During the hearing on the motion for new trial, Juror No. 8 testified as to her understanding of the trial court's question, averring that she did not hear the trial court ask whether any member of the panel had been a victim or a complainant in a sexual abuse case as a child:

> That wasn't exactly the question [the trial court] asked. She asked if you had known somebody or been in that situation and you therefore would have a bias and could not correctly judge someone involved in that issue. That is what I heard her ask, yes.

Juror No. 8 testified she did not raise her hand in response to the question because she believed that even though she had been sexually assaulted as a child, "that would not hinder [her] ability to be fair in the trial, which was the question [the trial court] asked."

In *Armstrong v. State*, the Court of Criminal Appeals addressed a similar situation involving the understanding of a venire member ("Thornburrow") of a voir dire question posed by the court. 897 S.W.2d 361, 362 (Tex. Crim. App. 1995). During voir dire, the trial court asked whether any of the venire members knew any of the attorneys on the case, including county attorney Tom Wells, one of the prosecutors:

> Now, are there any of you who have any—well, I will say are so well acquainted with Mr. Wells—I know that most of you know him, he hopes that all of you know him—or with Mr. Ashmore in his office, or Mr. Chuck Superville, that's another assistant, or Mr. Scott McDowell? They are the prosecution staff. Are there any of you who are so well connected with them or acquainted or associated with them that it might affect your verdict? I take it there are none.
>
> Are there any of you who have any special connection with the County Attorney's office, perhaps a close friend in the office, secretary, investigator or the like?

*Id.* No venire members responded to the questions. The prosecuting attorney subsequently asked:

> Sometimes we fail to ask a questions (sic) that touches on your qualifications. My question to you at this time is is there anything that any of you can think of that touches on your qualifications not in just any case but in this specific case that you think needs to be pointed out to me and Mr. Jackson [the defense attorney] and the court at this time? If so, raise your hand and you may want to approach the bench and tell it to the court out [of] the presence of the other jurors.

*Id.* at 363. Thornburrow did not respond to the question. The defense counsel did not ask any follow-up questions regarding the panel's relationships with any participating attorneys.

During a hearing on the appellant's motion for new trial, there was "undisputed evidence" that Thornburrow had known County Attorney Wells for at least twenty-six years and "described him as a friend." *Id.* Thornburrow's husband and Wells had been the best man in each other's weddings and Thornburrow's husband was Wells' campaign treasurer during trial. *Id.* During the hearing on the motion for new trial, Thornburrow testified she had answered the voir dire questions honestly, stating that "her silence in response to the first question by the judge was the appropriate response because her relationship with Wells would not affect her ability to be fair as a juror." She testified that she "answered [the trial court's] question fairly: "[The trial court's] question was did we know anyone well enough to keep us from being fair, and my response indicated that I knew no one well enough to keep myself from being fair." Thornburrow further testified she did not answer the prosecutor's question because

she "felt that [she] had already answered the question" and that she had "already responded about the fairness and [thus] did not come forward." *Id.*

The court of appeals held there was no juror misconduct, and that Thornburrow did not withhold any material information because she was never specifically asked if she knew or was acquainted with the county attorney. *Id.* In affirming the court of appeals, the Court of Criminal Appeals explained that "[t]he questions by the trial judge and the prosecutor were subjective in nature. If Thornburrow concluded that her acquaintance with the prosecutor would not affect her ability to be a fair juror, then the appropriate response to those questions was no response." *Id.* at 363. The court added, "defense counsel has an obligation to ask questions calculated to bring out that information which might be said to indicate a juror's inability to be impartial and truthful. Unless defense counsel asks such questions, the material information which a juror fails to disclose is not really 'withheld.'"[16] *Id.* at 363–64; *see also Hicks v. State*, 606 S.W.3d 308, 317 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) ("There is a 'necessity' that defense counsel 'ask during voir dire all of the relevant statutory questions to

---

[16]   *See generally Ashton v. State*, 526 S.W.3d 490, 498 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (holding when defense counsel asked whether prospective jurors had close family member involved with law enforcement but did not ask whether prospective jurors had non-familial relationships with law enforcement officers, counsel "did not ask questions that were calculated to uncover the jurors' non-familial relationships with" detective, and two prospective jurors did not withhold information during voir dire).

42

determine whether a juror may be disqualified.'") (quoting *Webb v. State*, 232 S.W.3d 109, 113 (Tex. Crim. App. 2007)).   Like Thornburrow, Juror No. 8 testified she understood the court's voir dire question to inquire as to her ability to be fair and nothing beyond that.

Diaz argues "[b]eing a victim of sexual abuse is clearly material information because it has a tendency to show bias."  Assuming without deciding that Juror No. 8's previous sexual assault had a tendency to show bias, the trial court properly conducted a hearing to determine whether she was actually biased.  *See Gutierrez*, 541 S.W.3d at 100 (citing *Uranga v. State*, 330 S.W.3d 301, 306 (Tex. Crim. App. 2010)).  After a hearing, "[i]f a trial judge finds that the juror is not actually biased, and that finding is supported by the record, then the defendant has not been harmed by the violation of his constitutional right to an impartial jury."  *Id.* (citing TEX. R. APP. P. 44.2(a)).  In the present case, Juror No. 8 testified that she was one of three holdouts *in favor of* Diaz.  She testified about her conversation with the jury foreperson:

> I told him that I was a holdout because I wanted—I had had that experience when I was young, and I wanted to make sure that I thought the whole thing through and it was not at all being biased to the defendant.  And that's why I wanted them to know because I was one of the three holdouts for him, not against him.

In light of Juror No. 8's testimony that she was favoring acquittal at some point during deliberations, the judge reasonably could have found that she was not

"actually biased." *See* TEX. R. APP. P. 44.2(a); *see also Gutierrez*, 541 S.W.3d at 100 (noting appellate courts review trial court's determination of historical fact for abuse of discretion and should give "almost total deference" to trial court's determination if supported by appellate record).

We hold the trial court did not err in denying the motion for new trial based on alleged bias related to Juror No. 8's failure to disclose her sexual assault during voir dire.

## C.    Diaz's Failure to Testify

Diaz next argues that the jurors' consideration of his failure to testify constitutes "improper bias" entitling him to a new trial.    In support of his argument, Diaz argues that:

- The trial court referred to the Fifth Amendment right against self-incrimination as "that crazy law"; and

- The trial court did not read the Fifth Amendment instruction during the "formal reading" of the jury charge but read it in its entirety after concluding her reading of the remainder of the charge.

Diaz argues without authority that these "inadvertent acts" "signaled to the jury that the Fifth Amendment admonishments are not crucial to the jurors' consideration of the case."  Diaz further argues without citation to authority that

Jane Doe's question inquiring why defense counsel had not called Diaz to testify eliminates the presumption that the jury followed the given instructions.[17]

The State responds that the only evidence proffered in support of the motion for new trial—the paralegal assistant's affidavit describing the conversation that allegedly occurred with Jane Doe while counsel was visiting with the jury after they rendered their verdict—was inadmissible under Rule 606(b)(1) because it "related entirely to juror deliberations." Rule 606(b) provides that a juror may not testify about "any statement made or incident that occurred during the jury's deliberations," except that a juror may testify about "whether any outside influence was improperly brought to bear upon any juror" or "to rebut a claim that the juror was not qualified to serve." TEX. R. EVID. 606(b).

The State failed to obtain a ruling on its Rule 606(b) objection, as well as on its hearsay objection to the affidavit. To raise an issue on appeal, error must be preserved by obtaining an adverse ruling from the trial court. *Dixon v. State*, 2 S.W.3d 263, 265 (Tex. Crim. App. 1998) (noting party must obtain adverse ruling from trial court to preserve error for appeal); TEX. R. APP. P. 33.1(a) (explaining procedure for preservation of complaint for appellate review). The State thus failed to preserve its objections to the affidavit.

---

[17]  In the absence of authority to the contrary, we decline to hold that a juror's question inquiring why defense counsel had not called the defendant to testify, without more, indicates the juror disregarded the trial court's instructions not to consider the failure of a defendant to testify in adjudicating guilt.

Even considering the affidavit, we conclude the trial court did not commit error. "To establish jury misconduct because of a discussion of the defendant's failure to testify, the defendant must prove that the misconduct occurred, that it was material, and that it caused injury." *Barnett*, 847 S.W.2d at 679 (citing *Garza v. State*, 630 S.W.2d 272 (Tex. Crim. App. 1981)). "The casual or incidental mention of a defendant's failure to testify will not constitute grounds for a new trial, especially when there is no specific evidence of materiality or injury." *Id.* (citing *Nacol v. State*, 590 S.W.2d 481 (Tex. Crim. App. 1979)); *see also Smith v. State*, 873 S.W.2d 66, 70 (Tex. App.—Tyler 1993, pet. ref'd) ("Not every mention of an accused's failure to testify requires reversal of the conviction.") (citing *Powell v. State*, 502 S.W.2d 705 (Tex. Crim. App. 1973)).

There is no evidence that Jane Doe's statement about Diaz's failure to testify caused injury. The affidavit from the paralegal assistant stated that the first juror defense counsel spoke to stated that while she could not "definitively confirm verbatim the alleged statement made" by Jane Doe, she "remembered a statement to that effect." She stated, however, that the statement "was not discussed openly or taken as a circumstance against [Diaz] during jury deliberations." The second juror to whom Diaz's counsel spoke stated he remembered Jane Doe's statement but that the statement did not play a role in the jury's deliberation process.

Given there is no evidence Jane Doe's statement to defense counsel was made to the jury or considered during deliberations, we hold the trial court did not abuse its discretion in overruling the motion for new trial on the basis of the statement about Diaz's failure to testify. "To constitute reversible error, the reference must amount to a discussion by the jurors or used as a circumstance against the accused." *See Berry v. State*, 976 S.W.2d 735, 737 (Tex. App.—Tyler 1998, pet. ref'd) (affirming trial court's overruling of motion for new trial, noting "complete absence of an explicit statement by any juror that they voted for a conviction based on Appellant's failure to testify").

We overrule Diaz's second issue.

### Cross-Examination Concerning Motive

In his third issue, Diaz argues that the trial court's exclusion of certain questioning of Sophie violated the Confrontation Clause of the Sixth Amendment of the United States Constitution.

### A. Standard of Review

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The standard of review for an alleged violation of the right to confront a witness is abuse of discretion. *Lagrone v. State*, 942 S.W.2d 602, 613 (Tex. Crim. App. 1997). "[T]he trial court exceeds

its discretion only when it prohibits a defendant from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Id.* In reviewing for abuse of discretion, an appellate court should uphold the trial court's ruling "[u]nless the trial judge's decision was outside the 'zone of reasonable disagreement[.]'" *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006).

**B.    The Testimony**

During Diaz's cross-examination of Sophie, the following exchange transpired:

Counsel for Diaz:  Isn't it true that the criminal charges that were brought [against Diaz], were brought after there was litigation—

The State:         Objection, your Honor.  Relevance.

The Court:         You want to rephrase that question?

Counsel for Diaz:  Goes to motive, your Honor.

The Court:         I need to hear the rest of the question.

Counsel for Diaz:  Okay.

The State:         May we approach?

The Court:         Sure.

(Conversation at the bench.)

The State:         I believe counsel's trying to get into mediation or something about the family law, civil issue that's

48

between the mother and the defendant over [Johnny], which is no relevance as to her or her credibility.

Counsel for Diaz: No. What I'm getting into is the fact that these criminal charges [against Diaz] were brought after we had litigation with the OAG seeking more visitation with the child [Johnny]. Once we sought that, the—

. . .

What happened was, we sought additional visitation for the young boy; and once we sought that, that's when she filed these criminal charges. And so I think that the timing is very relevant and it goes to this—to motive. For example, with the boy Saul, it took her a day or two to jump into action. With this one, it took eight years and only after we sought additional visitation [for Johnny] is when she did it. And I think it goes to the legitimacy of the charges, the motive.

The Court: Wouldn't that be Mom's motive and not her [Sophie's] motive?

Counsel for Diaz: I'm sorry?

The Court: Wouldn't that be Mom's motive and not her motive?

Counsel for Diaz: Well, but I can at least ask her [Sophie] if that's what happened and I'll prove it up through the mother, if they call the mother.

The Court: You can ask her. I'm sure [the State is] going to object because in my mind that's something that the Mom would—

The State: The State is gonna object.

49

The Court:   That's a motive for the mom, that's not necessarily a motive to her [Sophie].

Counsel for Diaz: Okay. I'll just go to the mother. I'll go through the mother.

## C. Preservation of Error

Diaz argues on appeal that in denying him the ability to pursue this line of questioning during his cross-examination of Sophie, the court "presupposed that a 17[-]year-old would not have a motive to bring false allegations for the purpose of assisting her mother get custody of her younger sibling."[18] He argues that by doing so, the trial court appears to suggest that seventeen-year-old individuals are not fully capable of interacting with the legal system or in adult matters. Diaz then provides examples of how children under seventeen can function as adults, or participate, in the legal system, such as being tried as adults for certain felonies, informing a court about their preferred custodial parent, and obtaining a driver's license, and being employed. Diaz also provides examples of testimony by experts in unrelated cases regarding statistics of allegations of false sexual abuse that are related to custody or divorce matters. Even if these examples were relevant and probative of the issue at hand, we may not consider them because Diaz failed to preserve error for appellate review.

---

[18] Although she was nineteen at time of trial, Sophie was seventeen when she reported the alleged abuse to law enforcement authorities.

The record does not reflect that Diaz made a constitutional argument in the trial court with respect to his inability to cross-examine Sophie about the timing of the criminal charges brought against Diaz. That is, he "'did not clearly articulate' that the Confrontation Clause demanded admission of the evidence," so the trial court judge "never had the opportunity to rule upon" a Confrontation Clause objection. *See Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) (holding appellant's failure to argue Confrontation Clause "demanded admission of the evidence" failed to preserve error) (citing *Clark v. State*, 881 S.W.2d 682, 694 (Tex. Crim. App. 1994)). Having failed to make a constitutional argument during trial, he is precluded from raising it on appeal. *Reyna*, 168 S.W.3d at 179–80; *see also Golliday v. State*, 560 S.W.3d 664, 671 (Tex. Crim. App. 2018) ("Appellant did not clearly articulate a constitutional basis supporting the admission of the excluded evidence at trial. Consequently, he did not preserve a constitutional claim for appeal."); *Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012) ("[T]he trial court should know when it is being asked to make a constitutional ruling because constitutional error is subject to a much stricter harm analysis on appeal.") (citing TEX. R. APP. P. 44.2(a), (b)).

In addition to failing to preserve a constitutional challenge, he failed to preserve any challenge to the purported exclusion of his line of questioning. Indeed, it is not entirely clear that trial court precluded the questioning at issue:

51

| | |
|---|---|
| The Court: | You can ask her. I'm sure [the State is] going to object because in my mind that's something that the Mom would— |
| The State: | The State is gonna object. |
| The Court: | That's a motive for the mom, that's not necessarily a motive to her. |
| Counsel for Diaz: | Okay. I'll just go to the mother. I'll go through the mother. |

The trial court did not expressly rule that the questioning was excluded. On the contrary, the testimony reflects the court indicated Diaz could ask the questions to which the State likely would object. The State indicated it would object, at which point Diaz stated he would ask Marie the questions instead, "I'll just go to the mother." As we note below, Diaz indeed questioned Marie about this issue.

To complain on appeal, error must be preserved by obtaining an adverse ruling from the trial court. *Dixon*, 2 S.W.3d at 265 (noting party must obtain adverse ruling from trial court to preserve error for appeal); TEX. R. APP. P. 33.1(a) (explaining procedure for preservation of complaint for appellate review); *Johnson v. State*, 925 S.W.2d 745, 750 (Tex. App.—Fort Worth 1996, pet. ref'd) ("An appellant must object or offer argument in response to the State's objection to preserve error for appellate review when the trial court excludes evidence.") (citing *Johnson v. State*, 629 S.W.2d 731, 733–35 (Tex. Crim. App. 1981)). Diaz did not get an adverse ruling from the trial court. "Absent a definitive ruling, the trial

judge did not commit error." *Wallace v. State*, 782 S.W.2d 854, 856 (Tex. Crim. App. 1989).[19]

We thus conclude Diaz failed to preserve this argument for appellate review.

**D.    Harm**

Even if Diaz's appellate issue had been preserved for our review, he would not prevail on this issue.    Assuming the trial court abused its discretion by preventing Diaz from cross-examining Sophie about the timing of her pursuit of charges against Diaz, we cannot reverse on this basis unless Diaz was harmed by the error.    *See* TEX. R. APP. P. 44.2.[20]    All errors are subject to harmless error analysis under Texas Rule of Appellate Procedure 44.2, except for a narrow category of errors identified by the United States Supreme Court as "structural" errors.[21]

Diaz neither argues he was harmed because he was prevented from cross-examining Sophie about her motive in pursuing the allegations against Diaz, nor

---

[19]    The State also argues that this issue was not preserved because Diaz failed to make an offer of proof of the testimony he sought to elicit.  Given our holding, we need not decide this additional argument.

[20]    *See generally Perry v. State*, 236 S.W.3d 859, 869 (Tex. App.—Texarkana 2007, no pet.) (holding because appellant "failed to preserve his constitutional right of confrontation, the test in determining if the error is reversible is that found in TEX. R. APP. P. 44.2(b)").

[21]    Only a narrow class of errors involving the deprivation of federal constitutional rights are considered structural errors.  *Johnson v. U.S.*, 520 U.S. 461, 468–69 (1997).

does he assert this alleged error fits one of the narrow exceptions that are immune from the harmless error analysis. Moreover, given our review of the record, we conclude the error was harmless because Diaz was able to introduce similar evidence elsewhere at trial. *See Womble v. State*, 618 S.W.2d 59, 62 (Tex. Crim. App. 1981) ("This court has consistently held reversal is not required by exclusion of evidence where the same testimony was later admitted without objection." (internal citations omitted)); *Barahona-Ramos v. State*, No. 01-23-00096-CR, 2024 WL 2965238, at *15 (Tex. App.—Houston [1st Dist.] June 13, 2024, pet. ref'd) (mem. op., not designated for publication) ("The improper exclusion of evidence is not reversible if the same or similar evidence is admitted at trial without objection."); *Mitchell v. State*, No. 07-22-00359-CR, 2023 WL 4635054 at *4 (Tex. App.—Amarillo July 19, 2023, pet. ref'd) (mem. op., not designated for publication) ("The standard for the exclusion of cumulative evidence and harmless error dictates that no harm results when evidence is excluded if other similar evidence is admitted.") (citing *Womble*, 618 S.W.2d at 62).

At the conclusion of the bench conference regarding Diaz's desire to cross-examine Sophie about the timing of the charges against him, the State argued it would object to the cross-examination and Diaz said, "Okay, I'll just go to the mother. I'll go through the mother." During Marie's cross-examination, Diaz's counsel did exactly that:

Counsel for Diaz: You're currently in litigation with [Diaz]?

The State: Objection, Your Honor. Relevance.

The Court: Overruled.

. . .

Counsel for Diaz: You're currently in litigation with [Diaz] in Conroe regarding visitation with [Johnny] and [Diaz]?

Marie: Yes.

Counsel for Diaz: And isn't it true that you didn't seek to file charges against [Diaz] until there was litigation in Montgomery County to allow more visitation for [Diaz] and [Johnny]?

Marie: I do not understand.

Counsel for Diaz: Okay. Well the question that I need answered is, when did you become aware that [Diaz] was seeking additional visitation with [Johnny] in Montgomery County?

Marie: When I went and filed for child support.

Counsel for Diaz: So my question though was slightly different. When did you become aware, and I'm trying to get a month or a year, that [Diaz] was seeking additional visitation with [Johnny] in connection with the office of the Attorney General's lawsuit pending in Conroe, Texas?

Marie: In December.

Counsel for Diaz: And thereafter, in May of this following year was when charges were filed against [Diaz], correct?

Marie:            I do not know.

Counsel for Diaz:   Okay.  And after charges were filed, isn't it true that that was then and only then that you took your daughter to a mental health counselor?

Marie:            I do not remember.

The State argues Marie's testimony in front of the jury was "the same or substantially [the] same evidence" that would have been elicited had Diaz been allowed to cross-examine Sophie about the timing of the charges.  We agree. Diaz's counsel was able to convey to the jury the impression that the charge against Diaz was pursued only after he sought a change in his visitation with Johnny.  Indeed, based on Marie's testimony, he made that exact argument in his closing,[22] during which he said:

> But then there was the interaction with [Diaz] for which we are here today and there was a delayed response, which brings to mind a couple of things.  I understand all of the excuses for the delayed response, and literally it was years.  But why was there no delayed response on Saul but there was on [Diaz]?  I think the reason is [Diaz] didn't do it.  And only when civil litigation was involved, as there has been testimony of civil litigation regarding custody and support of [Johnny] up in Montgomery County, then all the sudden, once again, [Marie's] up to her old tricks.  She's going to weaponize the allegations of sexual abuse.

He continued:

---

[22]   We are cognizant that the arguments of counsel are not evidence. *See Freeman v. State*, 340 S.W.3d 717, 728–29 (Tex. Crim. App. 2011) (noting counsel "may not use closing arguments to present evidence that is outside the record").  We refer to the closing in support of our conclusion that the evidence Diaz argues was excluded from Sophie's testimony was admitted through Marie's testimony.

You can consider is there a motive. Well in this case we know there's a civil case and there's custody and money involved. We know that there was a delayed outcry, and why is that delayed outcry important? Because historically, this unfortunate family that seems to have sexual abuse cases more than normal, they made an immediate outcry with Saul, but they made a delayed outcry in this case.

Finally, he argued to the jury:

I think what is so telling is that with the case with Saul, she did it immediately. But with the case of [Diaz], there was a long delay. And I say to you, if custody of [Johnny] and child support were not issues, that we wouldn't be here at all.

In light of Diaz's failure to preserve error, and given his failure to establish harm in any event, we hold his challenge to the trial court's exclusion of motive testimony lacks merit.

We overrule Diaz's third issue.

## Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

Do not publish. TEX. R. APP. P. 47.2(b).